# EXHIBIT I

# In the Matter of:

*The Jones Company*

*vs.*

*Signature Flightlance Support, LLC d/b/a Signature Aviation*

---

## Keith M. Bransky

February 24, 2026

---

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


THE JONES COMPANY          CIVIL ACTION NO.
                                25-1645
VERSUS

                           DISTRICT JUDGE
SIGNATURE FLIGHTLANCE M. AFRICK
SUPPORT, LLC
D/B/A SIGNATURE            MAGISTRATE JANIS
AVIATION                   VAN MEERVELD


* * * * * * * * * * * * * * * * * * * * * * * *


       Remote deposition of KEITH M. BRANSKY,
4355 Cobb Parkway, Atlanta, Georgia 30339
commencing at 12:07 P.M., on Tuesday, the 24th
day of February, 2026.


APPEARANCES:


    PIPES | MILES | BECKMAN
    (By:  Jeffrey A. Clayman, Esquire)
    1100 Poydras Street
    Suite 3300
    New Orleans, Louisiana  70163
      (Attorneys for the Plaintiff)


    MOULEDOUX, BLAND, LEGRAND
    & BRACKETT, LLC
    (By:  Mark E. Hanna, Esquire)
    701 Poydras Street
    Suite 600
    New Orleans, Louisiana  70139
      (Attorneys for the Defendant)

ALSO PRESENT:


    Robert Preece



REPORTED BY:


    KATHY ELLSWORTH SHAW, CCR, RPR
    Certified Court Reporter
    Registered Professional Reporter
    (No. 049519)

EXAMINATION INDEX


                                              PAGE


EXAMINATION BY MR. HANNA......................5


              EXHIBIT INDEX

EXHIBIT NO. 1................................10
  (Mr. Bransky's C.V.)

EXHIBIT NO. 2................................26
  (Mr. Bransky's C.V. dated January 5th,
   2026)

EXHIBIT NO. 3................................27
  (Document entitled "Keith M. Bransky, ASA:
   Authored Publications")

EXHIBIT NO. 4................................33
  (Document entitled, "Keith Bransky:
   Testimony, Affidavits, and Related
   Proceedings")

EXHIBIT NO. 5................................58
  (RE-NOTICE OF DEPOSITION)

EXHIBIT NO. 6................................65
  (In-globo documents Bates labeled
   Bransky-STD_90, _242, _92, and _60)

EXHIBIT NO. 7................................68
  (Embraer 28-page document Bates labeled
   Bransky-STD_674 - _701)

EXHIBIT NO. 8................................71
  (Document entitled, "Aircraft Maintenance
   Logbook," Bates labeled Bransky-STD_207)

EXHIBIT NO. 9................................92
  (Report from Mr. Bransky dated 6/14/25)

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically waived.

That the formalities of filing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

*       *       *       *       *

KATHY ELLSWORTH SHAW, Certified Court Reporter, State of Louisiana, officiated in administering the oath to the witness.

KEITH M. BRANSKY, after having been first duly sworn by the above-mentioned Certified Court Reporter, was examined and testified as follows:

EXAMINATION BY MR. HANNA:

Q.   Good afternoon, Mr. Bransky.  My name is Mark Hanna.  I represent Signature Aviation, and we understand that you've been tendered as an expert on behalf of The Jones Company.

You understand that we're going to be taking your deposition relative to your opinions you authored in a report that was shared with us relative to this case?  You understand that?

A.   Yes.

Q.   Okay.  I'm going to get some background information and then we'll get into your report.

Please go ahead and state your full name for the record.

A.   Keith Michael Bransky.

Q.   And your business address again?

A.   My business address is 4355 Cobb Parkway, Suite J106, Atlanta, Georgia 30339.

Q.   Okay.  And have you ever given a deposition or testified in trial before?

A.   Yes.

Q.   How many times have you been deposed or testified at trial?

A.   Well, in the past five years, which I believe I put on the documents sent to Mr. Clayman, it's five times, but it's been more than that over my entire appraisal career.

Q.   Okay.

A.   And testifying, four times.  One time in the past five years.

MR. HANNA:

     Let's go off the record.

     (Whereupon a discussion was held off the record.)

MR. HANNA:

     Let's go back on the record.

EXAMINATION BY MR. HANNA:

Q.   So, Mr. Bransky, when is the last time you gave testimony?

A.   In the first part of last year, 2025.  I believe it was February, in Phoenix.

Q.   Okay.  So it's been awhile since you've given a deposition and this may be

something you've already heard before, but I'm going to provide a couple rules of road for you to consider throughout the deposition today.

First, if you do not understand my question, please tell me.  I don't want you to guess at the meaning of the question.  We certainly don't want you to guess with your answers.  And it's okay to say that you don't know the answer to something if you truly don't know.  But if you find my question confusing, you need a word defined, you need me to break the question down, I'm happy to do that so that you can give an accurate answer.  Okay?

A.  Yes.

Q.  Try to answer all questions out loud as you're doing so far.  Use "yes," or "no," where appropriate.  Avoid, "uh-huh," "unh-unh," shaking of the head, any other nonverbal response.

A.  Okay.

Q.  So make sure you speak up nice and loud.

If you need to take a break at any time -- I'm sure we'll take a break at some point during the deposition, but if you need a

break to use the restroom or somebody is texting you with an emergency, we can certainly take a break.  The one thing I do ask is that if there's a question on the table, that you answer that question before we take a break.

Lastly, try not to bring conversation habits into the deposition.  This is a question-and-answer session, like a serve-and-volley in a tennis match.  So try not to anticipate my question and start talking in response to my question before I'm done with the question.  The question may be different than what you thought it was.  And it makes it really challenging for the court reporter if two people are speaking at the same time.

On the flip side of that, Mr. Bransky, if you pause to collect your thoughts, I may take it that you're done with your answer.  And if you're not done, just please tell me that you were thinking about your answer and you needed more time to respond to the question.  But if a witness stops, I may conclude that the witness is done with the answer.  So speak up.  If that happens, I don't mean to step on your answer, but, you know,

just please tell me that you're not done with your question and I'll make sure that I allow you sufficient time to answer the question.

A.   Okay.

Q.   All that's understood?

A.   Yes, sir.

Q.   Okay, great.

What is your occupation?

A.   Currently, aircraft appraiser.  And I have retired from my previous job as a -- working for the airlines doing full-time aircraft appraisal.

Q.   And you do that under the name Jet Appraisal Corporation?

A.   Yes.

Q.   And how many employees are there of Jet Appraisal Corporation?

A.   It's just me.

Q.   Okay.  You don't have any sort of staff?

A.   No.

Q.   And I'm going to share with you your C.V. at this point.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q. Are you able to see the C.V.?

A. I am.

Q. Okay. And you see at the top it says, Keith Bransky Aircraft Appraisal Qualifications. (As read.) Is that right?

A. Yes.

Q. It goes down to the bottom with your flight hours and that's basically your one-page C.V.; correct?

A. Correct.

Q. Okay. We're going to go ahead and mark this as Exhibit 1.

Let's talk about your education. It says here that you obtained a Bachelor of Science in Aviation Management from Southern Illinois in June 1980. And then you also obtained an Associate of Applied Science in Aviation Technology, also June 1980 from Southern Illinois. Is that accurate?

A. That's accurate.

Q. And so in laymen's terms, what essentially are the different curriculums or what is the difference between these two degrees?

A.   The associate was the first two years at Southern Illinois University and it was part of the program to earn an Airframe and Power Plant Mechanic license.

Q.   And that's oftentimes referred to as an A&P?

A.   Yes.

Q.   Okay.  Continue.

A.   And the program at that time allowed the student to continue with full-time on-campus courses to get a Bachelors's in Aviation Management for years three and four.

Q.   And so with a Bachelor's in Aviation Management, what would be the typical career path that that Bachelor of Science would allow you to pursue?

A.   The bachelor's was an all-encompassing management degree that allows an individual, if they so desire, to go into management in the aviation and aerospace field.

Q.   All right.  So principally office work in aviation; is that right?

A.   Office work or management, correct.

Q.   Okay.  And then you were essentially a full-time pilot, it looks like, from 1980 to

about 2022; is that correct?  You started as an airline pilot in 1980 with Air Illinois in Carbondale and you then transitioned to Delta Air Lines where you worked from 1985 to 2022; is that right?

A.   Yeah.  Between Air Illinois and Delta, I flew for a company called People's Express Airlines.

Q.   Yes.  I see that as well.

So from 1985 to 2022, you were mostly flying large commercial jets?

A.   That's correct.

Q.   And then it suggests in your C.V. that you worked as an aircraft mechanic from 1977 to 1978 at Mount Holly Aviation performing maintenance and repairs on FAR Part 91 General Aviation Aircraft as a fixed-base operator or operation.

A.   That's right.

Q.   And just for lay people, what would constitute FAR Part 91 General Aviation Aircraft?

A.   Part 91 aircraft are aircraft that are not involved in charter or scheduled airline operation.  They're generally aviation

aircraft.

Q. So these are like private aircraft. Is that fair to say?

A. That's fair to say.

Q. And this maintenance and repairs -- were any of those on propeller-driven aircraft?

A. They were mostly on propeller-driven aircraft.

Q. Mostly on propeller --

A. Yes. Piston engines and turboprop engines.

Q. Not really any jet engine mechanic work?

A. At Mount Holly, no.

Q. Okay. And then it indicates that from 1979 to 1980, you were an aircraft mechanic for Air Illinois in Carbondale and you did work on FAR Part 135 and 121 air carrier turbine aircraft?

A. That's right.

Q. So describe the difference in those aircraft as compared to the aircraft you worked on at Mount Holly.

A. So the Part 135 and Part 121 aircraft were in those days separated and --

for-schedule air carriers.  Part 135 or smaller aircraft, 19 seats or less, and a gross weight of the aircraft limit.  Above that, we had 121 aircraft, which operated under the same rules as the larger airlines.

Q.   Okay.  And these were jet engines?

A.   No.  They're also turboprops.  Air Illinois did have some jet aircraft, but I did not operate those.

Q.   So all turboprop?

A.   Correct.

Q.   So that was your last experience working as an aircraft mechanic in 1980; correct?

A.   No.  I've owned aircraft since then and I've worked on those.  Additionally, I do work for nonprofit operations and give my time to certain groups that need my skills.  And I'm also involved with EAA.  And, again, I own aircraft, and I live on an airport.

Q.   And the EAA is what?

A.   The EAA is External Aircraft Association.

Q.   Okay.  But let's say this.  It's fair to say that your last full-time work on

your resumé as an aircraft mechanic was in 1980.  Is that fair to say?

A.   Yes.

Q.   You have not listed any significant aircraft mechanic employment or work on your C.V. after 1980; correct?

A.   Well, I think if you look under the Summary -- again, this is a summary.  If you can scroll up a little bit.

Q.   (Complies.)

A.   A little bit higher.

Q.   (Complies.)

A.   A little bit higher, please.

Q.   (Complies.)

A.   It says, Experimental Vintage Aircraft Operations.  (As read.)

That covers the EAA.  And then Vintage Aircraft Operation -- There's an organization called The Commemorative Air Force and -- that's involved with the restoration and operation of vintage aircraft from the World War II era.

Q.   And I appreciate that is in your Summary.  But under Professional Experience, this is kind of a chronology of the jobs you've

held, the jobs you've had in the aviation industry. And as far as listings under your Professional Experience, your last aircraft mechanic listing would be in 1980; right?

A. Yes.

Q. Everything after that, is basically working as a pilot, and also then as an aircraft appraiser and aviation expert from 1992 to the present; correct?

A. Yes.

Q. Okay.

A. Well, if we talk -- Can I restate that? If we're talking about for pay, but I do volunteer work for these other organizations.

Q. Okay. But you did not list that under your Professional Experience section of your C.V.; correct?

A. Correct. It's volunteer work.

Q. So let's say in the last five years, how many major repairs of aircraft have you done?

A. In the past five years -- Well, I built an aircraft and I've worked on other aircraft that have undergone restoration. But as far as putting my signature to a major

repair, I have not.

Q. Okay. And what types of aircraft have you worked on in the last five years?

A. Experimental aircraft. One is called a Lockwood Aircam. That's the one I built. Cessnas, small Cessnas, Diamond, DA-20. I used to own another experimental aircraft called a Highlander. And then at The Commemorative Air Force, we worked on all kinds of aircraft from P-51 Mustangs to PT-19 aircraft. Just whatever was in the hangar, we all pitched in and worked on.

Q. It would be fair to say that you've not done any work on any Embraer jets in the last five years; is that correct?

A. That's correct.

Q. It would be fair to say that you've never done any mechanic work on an Embraer jet; is that correct?

A. That's correct.

Q. So you've had no mechanical experience with an Embraer Phenom 300E at any time; correct?

A. As far as working on them, that's correct.

Q.   Okay.  Now, it's my understanding that you have an FAA-approved Mechanic Airframe and Power Plant certificate that was issued in October of 2021; is that right?

A.   Well, that's a little deceptive. The FAA does that every time you get a new rating or there's -- or you ask for a -- you move and you ask for a new license, but I actually received my A&P license initially in 1987.

Q.   Okay.  But if you go to the FAA website right now and you look -- you do an airmen inquiry for you, it shows your mechanic certificate date of issue is October 12, 2021. Are you aware of that?

A.   Yes.  And, again, that's the most recent issue of the license itself with the most recent address change.

Q.   Okay.  And you also have an Inspection Authorization through the district office through March -- issued March of 2025; is that right?

A.   That's correct.  And that also was issued in 1980, and it's renewed every two years.

Q. Okay. In the last 24 months, have you worked at least six months full-time as a mechanic?

A. I have been actively engaged as a mechanic, yes.

Q. For six months?

A. Yes. For the past year. The last renewal was in 2025. It's 2026 now. That's good until March 31st. I live on an airport. I work on my own aircraft. And, yes, I have been actively engaged.

Q. And do you have records that would establish the full-time mechanic work in that six months?

A. The FAA is very specific. It does not require full-time work. "Actively engaged" is a little bit vague, but purposely so, because when it first came out a few years ago, a lot of volunteers, a lot of folks who retired with mechanics licenses and wanted to work and do what I do for organizations like The Commemorative Air Force, petitioned to have that type of work included in "actively engaged," and the FAA relented. And that allows IA's to keep their certification.

Q. So you don't construe "actively engaged" as akin to full time?

A. I do not.

Q. Okay.

A. Say that again, please. Restate.

Q. Yes. You do not view the term of art "actively engaged," as similar to full time?

A. That is correct, nor does the FAA. Nor does the FAA tie-in "actively engaged" with being paid as well. "Actively engaged" is at the determination of the local FSDO. I present my records to them and based on my history of involvement in aircraft maintenance, it's renewed, along with taking an annual eight-hour continuing education.

Q. In the last 24 months, where have you done mechanic work over a period of six months where you have been actively engaged and that there would be a written record of your mechanic work?

A. I live on an airport. My hangar is about 200 feet from where I'm sitting now. And in there I have all my shop tools, and I have three airplanes.

Q. So this would be working for yourself on your own aircraft and undocumented as far as the amount of time and the specific maintenance work that is done. None of that can be documented or is documented; is that right?

A. Well, whenever you work on an airplane, it's required that you put into the logbooks the work that was performed. If that's what you mean by "documented." But I don't have a time card or a time sheet. It's not required.

Q. But you can show us your logbooks showing the six months of work of actively engaged mechanic work in the last 24 months; is that right?

A. The FAA -- Okay. I could. I could show you a logbook that has that information.

Q. Okay. All right. During the last 24 months, have you technically supervised other mechanics for at least six months?

A. No.

Q. During the past 24 months, for at least six months, have you supervised in an executive capacity the maintenance or

alteration of an aircraft?

A. Supervised, no. I've actually done the maintenance myself.

Q. Okay. So you contend that you have served as a mechanic under your certificate and rating for six months working on your own experimental aircraft and other aircraft that you have in your hangar; is that right?

A. Correct. Yes.

Q. Would you agree if an A&P is not current, then your IA is also not current?

A. If an A&P is not actively engaged in a two-year period prior to a renewal, you do not meet the qualifications for renewal.

Q. So A&P is necessary to be -- to have an Inspection Authorization, an IA; correct?

A. Correct.

Q. In the last 24 months, have you done any sheet metal work on any aircraft?

A. Sheet metal -- Can you clarify that?

Q. Yes. Using sheet metal as it comes from a manufacturer and using it in some form or fashion to repair or install on an aircraft?

A. Yes.

Q. You have done that. And that would

be reflected in an aircraft maintenance log for a plane that you own that you did that work on; correct?

A. Well, in the past 24 months, I have built an airplane and part of that process of building the airplane was sheet metal work.

Q. And what type of plane was that again?

A. It's called a Lockwood Aircam A-I-R-C-A-M.

Q. A very different aircraft than the Embraer Phenom 300E that we're talking about today; correct?

A. Yes.

Q. In the past 24 months, have you done any repair on a fuel tank?

A. Repairs, no.

Q. Have you ever done any repairs on a fuel tank at any time as an aircraft mechanic?

A. Yes.

Q. How long ago was that?

A. The last one was probably about ten years ago.

Q. Okay. I'm going to stop sharing your C.V. at this time.

Do you agree that you have to have a valid Inspection Authorization in order to sign off on major aircraft repairs?

A.    It depends.

Q.    Well, as I said, if it's a major aircraft repair, does an Inspection Authorization have to be valid in order to sign off on such a major aircraft repair?

A.    If the aircraft is being repaired at a repair station, you do not need to have an IA.

Q.    Okay.  Do you agree that a registered owner or operator of an aircraft is required by law to keep maintenance records?

A.    Yes.

Q.    Has your A&P certification ever been suspended?

A.    No.

Q.    Has your A&P certification ever been revoked?

A.    No.

Q.    Has your A&P certification ever been the subject of any disciplinary action?

A.    No.

Q.    Same questions for your Inspection

Authorization.  Has it ever been suspended or revoked?

A.  No.

Q.  Has it ever been the subject of any disciplinary action?

A.  No.

Q.  Okay.  I'm going to turn to the Publications.  And let me ask this question.  There was also this curriculum vitae that was included in your Expert Disclosers.  They look to be essentially the same, only, you know, slightly different typeset.

Do you recognize whether there's any difference in this C.V. and the one that I previously showed that I marked Exhibit 1?  Are they the same?

A.  Can I see the one you're referring to?

Q.  Yes.  I'll share it.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.  This C.V. is further into the production that was made as part of the Expert Disclosures in this case.  To me, it looked

like the same thing. It was just a different typeset, but I wanted you to look at it and tell me if there's anything different in this C.V. as compared to the one we previously looked at and marked as Exhibit 1?

A. I think on the Summary it's very similar. I just changed some verbiage to make it more clear.

Under the Certifications and Licenses, I added Certificate of Flight Instructor, MEI IGI -- MGI and IGI. Because I reinstated my Flight Instructor certificate last year after the other C.V. was included in the appraisal report.

And as far as -- If you can scroll down to the bottom, it would be helpful.

Q. (Complies.)

A. Everything else is the same. The date on that was 5 January '26. The other one was sometime in 2025, I believe.

Q. Okay. Just for clarification, this is page 58 of a hundred and four pages of Expert Disclosure. We'll go ahead and mark this C.V. as Exhibit 2. And this C.V. is dated January 5th, 2026.

Okay.  Then I'm going to turn to your Authored Publications.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.   And it looks like this is just a one-page document.  Do you see that?

A.   Yes.

Q.   Okay.  We're going to go ahead and mark that as Exhibit 3.

Okay.  So your publications include four entries in trade journals and one entry in the American Society of Appraisers Authoritative Source Textbook.  (As read.)

You see that?

A.   Yes.

Q.   Is that the extent of your publications?

A.   It is.

Q.   Okay.  And the MTS Journal was a trade journal that you published three of these articles in.  And basically all three of these deal with diminution in value; correct?

A.   Correct.  The first two -- The first one in 2015 was apparently so well received

that they asked me to rewrite it for an aviation-specific monthly journal and I did that. And I made a few, small changes.

And then the one in 2018 was an article on The New ASA's Definition of Damaged Aircraft Diminution in Value as it applies to the damaged aircraft.

Q. And the trade journals articles that are listed here, are those peer reviewed, or do you write them and submit them and they publish them?

A. I write them and submit them.

Q. Is it subject to any sort of review before it's published other than maybe a review for typographical errors and just to make sure the content fits within the MTS Journal?

A. Before it's published, no.

Q. Okay. And then you also published a trade journal article in 2021 in The Binder, Aviation Insurance Association --

A. That's correct.

Q. -- correct?

And what does The Binder -- Is that principally an insurance publication, or is that more heavily weighted towards aviation?

A.   Well, it is the Aviation Insurance Association so it is a hundred percent weighted towards aviation and aerospace insurance issues.  And I was asked to write an article for that -- for their trade journal.

Q.   Yeah.  And so I guess let me rephrase the question.  Perhaps it wasn't very clear.

Is that journal more heavily weighted towards the insurance issues or is it strictly more pure aviation issues?

A.   Well, it's -- The Aviation and Insurance Association is an association that deals with aviation insurance professionals and the issues that they deal with as a group.  And the monthly journal, The Binder, deals with insurance issues, aviation insurance issues of all types, including the subject:  Diminution in Value.

Q.   Okay.  So that article was primarily generated towards assessing valuation as part of a loss adjustment in the insurance industry?

A.   That's correct.

Q.   And that, also, was not peer reviewed; correct?

A.   That's correct.

Q.   And then you also have an American Society of Appraisers - Authoritative Source Textbook, Damaged Aircraft and Diminution in Value, Chapter 14.  And this is authored by you it says; correct?

A.   Correct.

Q.   And this is Valuing Machinery and Equipment, The Fundamentals of Appraising Machinery and Technical Assets.  (As read.)

A.   That's correct.

Q.   So this is more specific to specific machinery in an aircraft, or is this an overall valuation of aircraft as a whole?

A.   So the book deals with machinery appraisal.  Each chapter is a different area of valuing machinery.  There will be a chapter on marine issues with boats and marine.  And one of the chapters -- And there will be farm equipment, the construction equipment.  They all have their own chapter.  And Chapter 14 deals with aircraft appraisal.

Inside of that chapter, there's a section on "Appraising Damaged Aircraft and Diminution in Value."  That's the section that

I wrote.

Q.   And that's the 4th edition; correct?

A.   Correct.

Q.   So there were three prior editions in this American Society of Appraisers book; correct?

A.   Yes.

Q.   Okay.  And do you know who the authors were of the 3rd edition?

A.   Well, in the foreword, there's acknowledgements to a number of people.  I have a copy of that 3rd edition.

Q.   Do you remember who any of those people are?

A.   I do.

Q.   Okay.  Who are they?

A.   Well, I think I know where you're going with this, but one of them is Mr. Dufour.

Q.   Okay.  Ken Dufour?

A.   Correct.

Q.   He was the author of the 3rd edition; correct?

A.   He was a contributing author of the 3rd edition, yes.

Q.   As you were a contributing author of

the 4th edition?

A.   Well, actually, I wrote the section on "Damaged Aircraft, Diminution in Value" myself.  That was all mine.  I helped edit the whole chapter, but I did not completely write that one myself.

Q.   And what is the title of this authoritative source textbook, Aircraft Appraisal?

A.   The title of the source textbook is Valuing Machinery and Equipment, Fundamentals of Appraising Machinery and Technical Assets.

Q.   Okay.  Did you ever collaborate with Mr. Dufour when you worked on the 4th edition?

A.   No.  He was not involved with that edition.

Q.   But he was a prior author of the same textbook, if you will, in a prior edition; correct?

A.   He was involved with the 3rd edition, correct.

Q.   Okay.  We're going to attach that as Exhibit 3.

Now I'm going to turn to your testimony.

We're going to attach -- Well, let me ask this question. Is this testimony list complete and up to date?

A. In the past four years, yes.

Q. And we're going to go through that. We're going to attach that as Exhibit 4.

Okay. Let's just start from the top, January of 2025. Trial testimony Hopkins versus Aerosecure. (As read.)

What court was that in?

A. It was in Phoenix, Arizona.

Q. Is that federal or state court?

A. State court.

Q. And what did that case involve?

A. That case involved an aircraft that was in a maintenance shop and while it was in the shop, another smaller aircraft, a life support aircraft, somehow started -- the engine started and it ran into the left wing of the subject aircraft.

Q. Okay. And so were you working with Hopkins or were you working with Aerosecure?

A. Aerosecure.

Q. Aerosecure was the defendant?

A. Yes.

Q.   And did you do an appraisal report and valuation of the aircraft in that case, the damaged aircraft?

A.   I did.  I gave my opinion of damage, of damage diminution.

Q.   Okay.  And was that trial testimony? Strike that.

You gave trial testimony.  Did you also give a deposition?

A.   No.

Q.   Okay.  Did Aerosecure tender you as an expert in aircraft appraisal and valuation?

A.   No.  The insurance company did.

Q.   Okay.  Did the court accept you as an expert in aircraft appraisal and valuation?

A.   Yes.

Q.   Do you remember the names of the attorneys who were defending the case for Aerosecure?

A.   I would have to go through my files.

Q.   You don't remember their names?

A.   I don't.  No.  It was one attorney.

Q.   Where was that attorney from? Arizona?

A.   Phoenix.

Q.    Was there an appraisal expert on the other side for Hopkins?

A.    They had two.

Q.    Who was that?

A.    I'd have to go through my files to get that information.

Q.    Did the judge allow you to give opinion testimony as to diminution in value or appraisal in that case?

A.    Yes.

Q.    Okay.  Let's go to Deposition, Damaged Pilatus PC-12, Georgia.  (As read.)

Do you have any information relative to that case as far as the plaintiff and the defendant?

A.    Can you clarify that a bit?

Q.    Sure.  So in order for me to know anything about this case, I would need to know what court it was filed in and the name of the plaintiff and the name of the defendant and that's missing from this entry.

Is there any way that you can supply any of that because all this says is it was a damaged aircraft, you gave a deposition, and it had something to do with the State of Georgia?

A. Uh-huh. Yes. I could supply that. It has not gone to trial yet.

Q. Okay. What's the plaintiff's name?

A. Let me get that exact information for you.

Q. Okay. You're not prepared to offer that right now?

A. Well, if you want me to go through my files, I could look for it, but I don't have that information right here in front of me.

Q. Okay. Are you working with the plaintiff or the defendant in that case?

A. Plaintiff.

Q. What's the nature of that case?

A. A Pilatus PC-12, which is a single engine turboprop, was sitting on the ramp in Atlanta and a rather new helicopter, a Bell helicopter, came in for landing, and the rather inexperienced pilot misjudged his touchdown and struck the tailbone. It ended up the helicopter disintegrated and the main rotorhead and some other parts from the helicopter flew into the air and landed on the left wing of the aircraft, the subject aircraft, the PC-12, quite a ways away.

Q.   And you gave a deposition in November of 2024.  You said you were working with the plaintiff, so I assume that the defense attorney took your deposition; right?

A.   Yes.

Q.   Okay.  Do you have a copy of that deposition?

A.   I'm sure I do.

Q.   And you could provide that to counsel for The Jones Company; correct?

A.   I need to make sure that that's not confidential information, but if it's not confidential, I can do that.

Q.   Generally depositions are not confidential unless they're covered by a protective order by the court.

A.   Okay.

Q.   And so that case has not gone to trial?

A.   It has not.

Q.   Okay.  Do you know whether you have been the subject of any motion practice -- what's called a Daubert motion, D-A-U-B-E-R-T, to try to limit or exclude you from giving opinion testimony in that case?

A. I have not.

Q. You're not aware or that hasn't happened?

A. I am not aware.

Q. Let me ask a more general question to try to speed things up.

Are you aware in any of these cases of ever being subject to a Daubert challenge where an attorney tried to prevent you from testifying or limit you in any way from testifying?

A. I am not aware of that.

Q. Okay. Next, we've got August of 2023, Deposition, Damaged HondaJet, Georgia. (As read.)

What's the name of the plaintiff and defendant in that case?

A. I need to find out if I'm allowed to give that because that's settled and it might be confidential.

Q. Well, if it's a lawsuit, then the plaintiff and defendant are in a lawsuit. It's going to be a matter of public record. So you may not be able to reveal the contents of the settlement. That's certainly a legitimate

concern, but as far as just the name of the party, that's not going to be something that's subject to confidentiality.

All right. So you don't remember the names of the plaintiff and defendant in the HondaJet case?

A. Well, that just settled two weeks ago so I have to go into my records, but, yes, I can supply that information if it's allowed.

Q. Were you working with the plaintiff or the defendant?

A. On that one, the plaintiff.

Q. What are the facts in that case?

A. The aircraft was at a fixed-base operation and a ground power unit was plugged into the aircraft. And it went and -- After it was plugged in -- the pilots were in the cockpit -- another aircraft on the ramp noticed flames coming out of the ground power receptacle. And it created an electrical parking and enough heat that it seriously damaged the pressure vessel, the composite vessel on the HondaJet, and as well as putting a surge of electricity through the system.

Q. And what were you asked to do in

that case?

A.    Give an opinion of diminution in value post repair.

Q.    Same as in the Pilatus case?

A.    Correct.

Q.    And did the defense attorney take your deposition?

A.    Yes.

Q.    Do you recall the name of the defense attorney?

A.    I do not.

Q.    And you were not -- Strike that.

Next, you've got a written affidavit, June of 2023, Damaged Aircraft Diminution in Value, Arizona.  (As read.)

Were you working for the plaintiff or the defendant in that case?

A.    That one is an affidavit for the Hopkins versus Aerosecure.

Q.    Okay.  Same case?

A.    Yes.

Q.    All right.  And then October of 2023, you attended a mediation for a damaged Cirrus Vision Jet in Florida?

A.    It was Zoom.

Q. Okay. Were you engaged as an expert in that case?

A. I was.

Q. And is that the same case as the two entries below of June 2023 and October 2022, Deposition I, Deposition II?

A. Yes.

Q. That's all one case?

A. Correct.

Q. Who was the plaintiff? Who was the defendant in that case?

A. I worked for the defendant. Let me think now. Oh, that's right. I worked for the defendant. The insurance company engaged me for the defendant.

Q. Who was the defendant?

A. It was the Sebring Airport and the individual who worked for the airport who damaged the aircraft.

Q. And who was the plaintiff?

A. The plaintiff was the owner of the aircraft.

Q. Okay.

A. It was a partnership.

Q. And did you issue an appraisal

report in that case?

A.   I did.

Q.   Okay.  And tell me about the facts of that case.

A.   The HondaJet [sic] was sitting on the ramp in Sebring, the Sebring Airport, and a night security, a watchman was in a small vehicle, small car, the kind that they put the rotating yellow light on top of to drive around the airport for security, and he got too close to the aircraft and ended up running into it. And instead of stopping there, he backed up and forced the -- part of the aircraft to touch the ground with force and do damage to the tail, and as well as the barrel of the fuselage near the entry door.

Q.   And why were you deposed twice?

A.   One had to do with the damage; one had to do with -- This is -- Let me restate that.  I have to go back to my records.  But one had to do with the damage itself and one had to do with the loss of use.  I produced two different reports.

Q.   Okay.  So you gave opinions as to the extent of the damage, and then you also

gave a separate opinion as to diminution in value, loss of use; is that right?

A. The second one would have been loss of use.

Q. And you still have those reports?

A. I do, yes.

Q. And it looks like you also provided a written affidavit for that same case; correct?

A. Right. Well, those -- The written affidavits were those two reports. They were sworn to and entered into the courts.

Q. And the last entry, is that also the same case, the Cirrus Vision Jet case?

A. Yes.

Q. So the last four entries are all the same case?

A. Correct.

Q. Do you remember the name of the plaintiff lawyer?

A. I don't remember. I have it in my records.

Q. Do you remember the name of the defense lawyer?

A. I don't remember, but I do have it

in my records.

Q.   And the defense lawyer deposed you twice; correct?

A.   It would be the plaintiff's lawyer.

Q.   Oh, that's right.  I'm sorry.  You were working for the defense on that one?

A.   Yes.

Q.   I'm sorry.  The plaintiff lawyer deposed you twice?

A.   One was for the loss of use, and I believe -- There were two separate depositions. One was for the loss of use, and I believe the other one was for -- I'd have to go back to my records.  To the best of my recollection, one was for the loss of use and one was for the damage to the aircraft.

Q.   And do you believe you have copies of those depositions?

A.   I believe I do.

Q.   And at the mediation you just served as a support for the lawyer on the defense side as an expert; is that right?

A.   That's correct.

Q.   Okay.  All right.  And does this list accurately reflect all of your deposition

and trial testimony over the last four years?

A. It does.

Q. Separate and apart from the last four years, have you ever testified at trial at any other time?

A. Yes.

Q. Okay. How many times have you testified at trial other than what's reflected on your list, that single testimony in the Hopkins case?

A. Trial testimony; correct?

Q. Trial testimony.

A. Three times, trial testimony.

Q. So you testified in that Hopkins case. When else have you testified at trial?

A. I'd have to get my list out, but I believe it was either -- between 2010 and 2011.

Q. And in what capacity did you testify in that case?

A. It was for the plaintiff.

Q. Did you testify as an aircraft appraiser?

A. Yes, I did.

Q. And were you accepted by the court as an expert?

A.   I was.

Q.   And what court was that?

A.   That was in Georgia State Court.

Q.   Where at in Georgia?

A.   In -- I believe it was Augusta.  I'd have to go back to my records with that as well.

Q.   And you don't remember the plaintiff or defendant name?

A.   To the best of my recollection, it was -- I think it was the Southern Power Company was the defendant, and the plaintiff, who I was working for -- I don't remember their name.  It involved an aircraft that had been destroyed ten years earlier.  And both sides accepted my opinion of the value of the aircraft immediately prior to the crash.  But then the case really was about who was at fault.

Q.   Okay.  And there was a third case that you testified at trial.  What was that case about?

A.   Division of marital assets.

Q.   So you were giving appraisal value of an airplane that was part and parcel of a

divorce?

A.    Correct.

Q.    What court was that in?

A.    That was up in Cobb County, Georgia, I believe.

Q.    What year was that?

A.    Early 2000s.

Q.    Do you remember the names of the parties, the plaintiffs and the defendants?

A.    I can find it.  I do have that one.

Q.    And the court accepted you as an expert and allowed you to testify?

A.    Yes.

Q.    On aircraft appraisal?

A.    Yes.  On the value of the aircraft.

Q.    Okay.  And, I'm sorry, that Hopkins v Aerosecure case, you testified January of 2025.  What court was that in again?

A.    It was Phoenix.  I believe it was Phoenix State Court.

Q.    State Court in Arizona?

A.    Yes, it was.

Q.    Okay.  What percentage of your current work right now with Jet Appraisal Corporation involves matters that are in

litigation?

A. Over the course of the year, 80 percent approximately.

Q. What are you doing with the other 20 percent?

A. There will be appraisals dealing with opinions of value for financing, financial institutions. And I should also add, I get calls from insurance companies on matters that often are not even involved with -- don't make it to litigation.

Q. Of the 80 percent in litigation, what percentage is on the plaintiff side and what percentage is on the defense side over the last year?

A. I don't have that information. I can figure it out.

Q. You don't have any idea?

A. I'd say it's half and half. Over a five-year period, it's half and half, but I don't have an exact number.

Q. Okay. I want to turn back to your certifications and licenses of which I'm going to share again.

Q. Are you able to see that?

A.   No.

Q.   Oh, I'm sorry.  Can you see it now?

MR. HANNA:

(Puts document on the screen.)

THE WITNESS:

Yes.

EXAMINATION BY MR. HANNA:

Q.   Okay.  So your certifications and licenses are reflected here.  And this is your C.V. of January 5th, 2026, marked as Exhibit 2. Are all of these certifications and licenses current?

A.   Well, they are current in the sense that they don't expire, but I have not flown some of those -- if you look at the type of aircraft, I have not flown some of those for years.  I'd have to be checked out on them again.

Flight engineer turbojet, for example, there's no aircraft that have a need for a flight engineer.  And I have not done any aircraft dispatching for a number of years, but the certificates themselves are -- they don't expire.

Q.   Okay.  Have any of these

certifications and licenses that are listed here, any of them whatsoever, been subject to any discipline or adverse action?

A.    None.

Q.    You mentioned in your Professional Experience, American Society of Appraisers. (As read.)

How do you attain recognition as an Accredited Appraiser with the American Society of Appraisers?

A.    There's a number of requirements. There's a -- And I'm going by what was required when I became an appraiser with the ASA.  You have to have five years of full-time experience as an aircraft appraiser.  And there are courses the ASA requires that are put on by the ASA that deal with aircraft valuation.  Each one of those has an exam.  And then there's an exam for valuation, an ethics examination.  A log is required to present to the ASA for the appraisals you've done in the past five years. And then you're required to submit an appraisal report for review by ASA as well.  And then on top of that, there's a final examination.

MR. CLAYMAN:

Mark, if now is a good breaking point, can we take a five-minute break?

MR. HANNA:

Yeah. We can take a five-minute break now. Let's take a ten-minute break.

MR. CLAYMAN:

Okay.

(Whereupon a recess was taken.)

MR. HANNA:

Back on the record.

EXAMINATION BY MR. HANNA:

Q. So, Mr. Bransky, I was asking questions about your American Society of Appraisers accreditation. And you were telling me how you went about attaining that.

Let me ask you this question. Did you have to take a written test?

A. Yes.

Q. And did you pass it on the first time?

A. I did. There was more than one test.

Q. Is that accreditation subject to periodic renewal?

A.    It is.

Q.    And how often does it have to be renewed?

A.    Every five years.

Q.    When was the last time you were renewed with the American Society of Appraisers?

A.    2022.

Q.    Did you have to take a test at that time?

A.    No.  You have to have a number of -- There's a matrix, but it's a hundred hours of credits, either continuing education or other types of credits.

Q.    Okay.  And I saw somewhere in your production that you also reviewed the reports of third-party appraisers; is that right?

A.    As the appraisal reviewer, yes.  I have that credential.

Q.    And who provides that credential?

A.    The American Society of Appraisers.

Q.    And what were you required to do in order to get that credential?

A.    Pretty similar to the ASA designation; coursework and exams, and then a

submission of an appraisal review report.

Q. And when was the last time that you received that certification -- or accreditation, I should say?

A. They both renew in 2027.

Q. So it's five years. It was issued in 2022 and it renews in 2027. Is that what you're saying?

A. Well, it was not issued. That was my last renewal.

Q. Okay.

A. I should also add that USPAP requires updated participation in approved USPAP courses. Because I review them every two years when the new USPAP rules come out. There's also a 15-hour course. My next USPAP course is this year, and I have that course already scheduled in the next couple of months.

Q. Okay. You listed as of January 5th, 2026, Aircraft Appraised. (As read.)

And you don't list anything in here about Embraer; is that right?

A. (No response.)

Q. Do you need me to show it to you?

A. Yes, please.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q. Do you see where it says Aircraft Appraised? (As read.)

I don't see Embraer listed anywhere.

A. That's correct.

Q. Okay. So this is the first and only time you've ever done an appraisal on Embraer?

A. I believe it is.

Q. And you've never at any time had any experience working on Embraer aircraft as a jet mechanic; correct?

A. That's correct.

Q. In fact, you have no mechanic experience working on jets at all; correct?

A. Well, actually turning the wrenches on a jet, no. But I have done management work on jet aircraft, Boeings.

Q. Management work, that sounds like desk paperwork; correct?

A. Well, it was land maintenance management. In other words, aircraft were coming and going to the hub and I was the liaison with the contract maintenance people

and telling them what needed to be done at a particular shift.

Q. Okay. But you were never a hands-on jet mechanic?

A. That's correct.

Q. And the type ratings here for flying, those have to be renewed periodically; correct?

A. Well, once you go to a different airplane, if you want to go back and fly --

Well, let me restate my answer.

Those type ratings don't expire. My air and transport pilot license that I just got renewed after an address change, still has those on there. The FAA does not take those away if you're not current on the aircraft. So I still have that type rating.

Q. So if you want to fly a Boeing 767 right now, don't you have to go renew your type rating?

A. No. You do not renew the type rating. You go back to training and you get checked out again on the aircraft.

Q. Well, your type rating requires you to go back and do training; correct? If you

want to fly a 767 right now, even though you say your type rating doesn't expire, you're going to be required to go back and retrain in order to have that type rating be active and usable so you could fly a 767; right?

A.   That's right.

Q.   Okay.  All right.  You talk about your work as an Aircraft Broker here, 1987 to 1992.  Did you have any prior work with The Jones Company while you worked as an aircraft broker?

A.   I did not.

Q.   Have you had any prior dealings with The Jones Company before this matter that we're here for today?

A.   I did not.

Q.   Had you ever worked as an aircraft broker for an Embraer aircraft?

A.   I did not.

Q.   Okay.  I'm going to stop sharing.

Next, I'm going to show you the notice of deposition.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.   Okay.  Mr. Bransky, this is the Re-notice of your deposition set for today at 12 noon via Zoom.  And we also called for the production of various documents in Exhibit A.

Have you -- Does this look familiar to you?  Have you seen this before?

A.   I have.

Q.   You're familiar with the content; right?

A.   I am.

Q.   And do you believe that you have produced anything in your possession that would be responsive to our request for production as set forth in this notice of deposition?

A.   Have I produced anything or everything?

Q.   Do you believe that you have produced everything in your possession responsive to the request for production in this notice of deposition?

A.   I think so.  I did give two documents to Mr. Clayman yesterday, and maybe one on Friday -- a couple on Friday for him to pass along to you.  But, yes, I believe I'm compliant with that.

Q.   Okay.  Fair enough.  We're going to mark that and attach it as Exhibit 5.

Okay.  And I'm now going to turn to your report.

MR. HANNA:

Bear with me.

(Whereupon a pause occurred in the proceedings.)

MR. HANNA:

Okay.  I'm going to show you your report and specifically page 4 of 53.

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.   And this indicates that you were retained in this matter by Mr. Trent Cady, Chief Pilot of The Jones Company, on May 8th of 2025; is that correct?

A.   That's correct.

Q.   So your retention in this case was directly by The Jones Company; right?

A.   Correct.

Q.   And as I read your General Overview, you were asked in this fourth paragraph to develop an opinion as to the subject aircraft's undamaged market value and the subject

aircraft's post-repair diminution in value; is that right?

A. Right.

Q. So that's the scope of what you were asked to do and that's the scope of your opinions that you're offering today; is that right?

A. Well, there is a separate Scope of Work section in this appraisal report that is more detailed.

Q. But you were asked to develop opinions as to the aircraft's undamaged market value and then the diminution in value of the subject aircraft. That's what you were asked to do in this expert report; is that right?

A. That is correct.

Q. Okay. And if you were to testify at trial, these are the areas of opinion that you would offer to the court; right?

A. Correct.

Q. And what did you do to prepare for today's deposition?

A. I reviewed documents that I had, including the appraisal report itself, and I spent some time going over the appraisal

reports written by the two gentlemen that work for the other side, as well as I also received a report from a James Becker. These were all given to me late last week.

Q. And you did not include any information from Mr. Dufour or Mr. Preece in your expert report; correct?

A. That's correct.

Q. Because you did not have it at that time; right?

A. Correct.

Q. Okay. I'm going to turn to Part Two of your report first and this starts on page 18. It's captioned Part Two of Appraisal Report, Opinion of Post-Repair Diminution in Value. Effective Date, December 31st, 2024; correct? (As read.)

A. Correct.

Q. And then you have a Damage Event Summary; right?

A. (No response.)

Q. You have a Damage Event Summary for the Subject Aircraft? (As read.)

A. Yes.

Q. And you would agree that based on

the description of the damage, this cannot constitute major damage to this aircraft; right?

A. I did not -- Well, I did not classify it as major damage. That was my opinion.

Q. Okay. And the plane was ferried to Embraer from the Lakefront Airport here in New Orleans, Embraer being the manufacturer, so that they could evaluate it and make a determination as to what should be done next to address the damage to the airplane; correct?

A. Correct.

Q. And the airplane underwent a series of evaluations and inspections; right?

A. Correct.

Q. And you say that here in No. 5, Upon arrival at EEJS in KMLB, the Subject Aircraft underwent a series of evaluations and inspections. And on January 23rd, 2025, High Frequency Surface Eddy Current, (HFEC) -- that's in parentheses -- and Ultrasonic Thickness Inspections were performed by Power Aviation in Orlando, Florida; right? (As read.)

A.    Right.

Q.    These tests were investigating possible cracking and material thickness issues resulting from the Damage Event.  (As read.)

And you note that after testing was completed, the report stated that no relevant indications were noted at the time of inspection; correct?  (As read.)

A.    Correct.

Q.    Okay.  I'm going to stop sharing. That's from page 19 of your 53-page report.

Okay.  I'm going to show you this series of documents.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.    Are these the Ultrasonic and Eddy Current Inspection reports that you were referring to in that section?

MR. CLAYMAN:

Mark, does this have a Bates number?

MR. HANNA:

Bransky-SDT_90.

MR. CLAYMAN:

Gotcha.  Thank you.

EXAMINATION BY MR. HANNA:

Q.   Is that what you were referring to?

A.   I don't remember if that is the one or if that is the only one, but it looks like it.

Q.   Well, you mention in your report, January 23rd, 2025.  This one is dated January 23rd, 2025.  You agree?

A.   I do agree.

Q.   It says, No relevant indications are noted at the time of inspection; right?  (As read.)

Isn't that what it says?

A.   Correct.

Q.   Okay.  Then I'm going to show you Bransky 242, which is also dated January 23rd, 2025.  And this is a handwritten description of the work performed and test method.  And it also says, No relevant indications noted at the time of inspection and gives the thickness measurements that were recorded; correct?  (As read.)

A.   Correct.

Q.   Okay.  And this one -- And both of these documents are signed by an inspector or a

PAI representative in the case of Bransky-SDT_242.  You agree?

A.   I do agree.

Q.   And then I was going to show you -- There was an Ultrasound and Eddy Current Inspection report also dated February 3rd, 2025, and it also said, No relevant indications are noted at the time of inspection.  (As read.)

So it came back with no relevant indications just like the one from January 23rd, 2025.  Do you agree?

A.   I do agree.

Q.   And then lastly there was one, April 3rd, 2025.

MR. CLAYMAN:

Mark, what was the Bates number of the last one, please?

MR. HANNA:

That's Bransky-SDT_92.

EXAMINATION BY MR. HANNA:

Q.   And then this is Bransky-SDT_60. This is dated April 3rd, 2025.  Performed a High Frequently Surface Eddy Current Inspection per ETD2025-P300-05131551 in the area of

interest for possible cracking.  No relevant inspections were noted at the time of inspection; correct?  (As read.)

A.  Correct.

Q.  And that's done by Christopher Smith Power | Aviation Inspector.  So there was no indication of any cracking; right?

A.  Correct.

Q.  So essentially these were good results each time the test was done; correct?

A.  Correct.  I was -- Yeah.  Yes.

Q.  Okay.  We're going to attach these in globo as Exhibit 6, and it's Bates reference Bransky-STD_90, _242, _92, and _60.

Okay.  I'm going to stop sharing.

I'm going to go back to your report. Okay.  I'm going to share with you your report.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.  In Paragraph 6, you discuss two options.  Option A was to repair the damage, and Option B was to replace the entire wing; correct?

A.  Correct.

Q.   Okay.   And The Jones Company opted for a wing repair; correct?

A.   Yes.   At that time, they opted to repair the wing because the replacement wing would not be available for two years is what I was told.   That's what it said in the documents from Embraer.

Q.   Now, you're familiar with a 28-page Embraer Repair Record for the repair that was ultimately done; correct?   I can show it to you.

Do you remember seeing that?

A.   I can't see anything yet.

Q.   Well, I'm just asking you generally if you recall seeing that?

A.   Could you show it to me?   I probably -- I'm sure I saw it.

Q.   Yeah.   I'll show it to you.

A.   I just want to make sure we're talking about the same one.

Q.   Okay.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.   Okay.   Can you see this document,

Mr. Bransky?

A. Yes.

Q. Okay. So this is an Embraer document. It bears the number ETD2025-P300-05131551. As you can see, it's Bates labeled Bransky _674. You can see it faintly here. It's one of 28 pages. And if we go all the way to the end, the 28th page, that takes us to Bransky _701. Have you seen this document before?

A. Yes.

Q. It this essentially the repair record of the wing that was generated by Embraer?

A. Does that document include the logbook entry? One of them did.

Q. This document is paginated 1 through 28 and includes each of the pages as it's paginated by Embraer. Have you seen this document?

A. Yes.

Q. Okay. And so if we look on the first page, page 1 of 28, it describes the repair classification as minor; is that right?

A. It does.

Q.   Okay.  And then if we turn to page 24 of the Embraer document, this section, page 24 beginning on Bransky _697, is captioned Disposition; correct?  (As read.)

A.   Correct.

Q.   And below Disposition, it says permanent repair; correct?  (As read.)

A.   Correct.

Q.   And then it proceeds to provide in detail the nature of the repairs that were done to the wing; correct?

A.   Correct.

Q.   Okay.  It doesn't say "temporary repair" here.  It says "permanent repair"; correct?

A.   Correct.

Q.   Okay.  And what's described here in the following sections of this 28-page document reflects the work that was ultimately done on The Jones Company Embraer jet; correct?

A.   Correct.

Q.   Okay.  And I'm going to go ahead and attach this document, 28 pages, as Exhibit 7.

I'll stop sharing at this time.

And this aircraft had a maintenance

logbook; correct?

A. Correct.

Q. It was a relatively new aircraft, so its aircraft maintenance logbook was not very extensive; is that correct, based on your --

A. That's correct.

Q. I'm going to show you a page from the maintenance logbook.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q. And this is from Bransky-STD_207, so this is part of the documents that you produced.

You would agree that the FAA requires that there are certain legal requirements be met with aircraft maintenance logbooks; right? They have to be treated with a great deal of care and have to be truthful and accurate. Do you agree?

A. I do agree.

Q. Okay. And you would agree that this Aircraft Maintenance Logbook that's Bates labeled Bransky 207, appears to have a signature and an employee number from somebody

from Embraer?  Do you agree?

A.  I agree.

Q.  And was there anything when you reviewed this about the Aircraft Maintenance Logbook that caused you any concern?  Did it look to be in good order and typical of a proper legal logbook as maintained by an aircraft under FAA rules?

A.  It looked perfectly fine.  There were good entries.  Yes, there are no issues with that entry at all.

Q.  Okay.  And the last entry under Corrective Action, if you just follow along with me here, it says, Comply with the Embraer ETD2025-P300-05131151 -- I'm sorry -- 1551, which was the same 28-page document that we just looked at and marked as Exhibit 7.  ATA 57 wing repair, parentheses, permanent, end parentheses, on left lower wing between ribs 12 and 13.  (As read.)  You see that?

A.  Yes.

Q.  And so that indicated for purposes of this maintenance log for this aircraft, maintenance performed on this aircraft, that this was designated as a permanent repair;

correct?

A.    For purposes of airworthiness, yes.

Q.    Okay.  And we're going to mark this as Exhibit 8.  I'm going to stop sharing and go back to your report.

Okay.  I'm going to show you your report.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.    If you look at Paragraph 9 on page 20 of 53, which is also in the same section that we've been talking about, the Damage Event Summary, Paragraph 9 says, There was no change to the subject aircraft's post-repair weight and balance.  (As read.)  Is that right?

A.    That's correct.

Q.    Number 10 you stated, There were no special recurring inspections, operating limitations, or instructions for continuing airworthiness, paren, quote, ICAs, end quote, end paren, associated with this repair.  (As read.)  Is that right?

A.    That is correct.

Q.    Okay.  If this had been a temporary

repair, there would be special recurring inspections, operating limitations, or instructions for continuing airworthiness; is that correct?

A.   Well, there can be permanent repairs that require special inspections.  They wouldn't call them "temporary."  But in this case, this was a permanent repair in the context of airworthiness, correct.

Q.   There are times when an aircraft might be subject to a temporary repair where it's required that there be recurring inspections and operating limitations.  That sometimes does happen with temporary repairs, right?

A.   It can be.  Not often, but, yeah. The repair permit, it probably did -- it often will issue a repair permit with a temporary repair done to the aircraft, but typically a repair like this, even if it has an ICA that requires a special inspection at a certain number of hours or calendar date down the road, it will be considered a permanent repair.

Q.   Okay.  But this particular repair had no recurring inspections, operating

limitations, or instructions for airworthiness;
right?

A. That's correct.

Q. And then you go on to say in
Paragraph 11, The completed repair was almost
invisible externally from all angles. There
was just the slightest bit of visible
deformation, but it was minimal. (As read.)

That was your observation; right?

A. (No response.)

Q. Is that correct; Mr. Bransky?

A. Yes. Yes. I said, "That's
correct." Yes.

Q. I'm sorry. Have you in your
experience ever seen a temporary repair that
resulted in the necessity of recurring
inspections?

A. Yes. Again, I would not call it a
temporary repair. It was a repair --

Q. I'm not asking -- Mr. Bransky, I'm
just asking you a question. Put this case --
Put this Embraer aside. I'm asking generally.
Put this Embraer completely in a separate
basket.

Other than this Embraer, have you

ever seen an aircraft that had a temporary repair that required recurring inspections or had operating limitations?

A. No.

Q. You've never seen a temporary repair that required recurring inspections?

A. No, not a temporary repair.

Q. Okay. You've never seen a temporary repair that had operating limitations?

A. I've never seen a repair -- No. I'll say no. I've seen repairs that have them, but not a temporary repair.

Q. Okay. As somebody who -- and I'm going to stop sharing.

As somebody who provides opinions on appraisal of aircraft, do you agree that an owner of an aircraft has an obligation to try to mitigate or lessen the extent of their damage when the aircraft suffers damage?

MR. CLAYMAN:

Objection to the form.

THE WITNESS:

I don't understand. Could you please restate?

EXAMINATION BY MR. HANNA:

Q.   As an appraiser, do you believe an aircraft owner has an obligation to try to lessen or mitigate their damages if they suffer damage to the plane?

MR. CLAYMAN:

Same.

THE WITNESS:

I'm sorry.  I'm going to have to ask you to restate that again.  That doesn't really -- I don't understand.  What kind of obligation?

EXAMINATION BY MR. HANNA:

Q.   Let me give you the definition of mitigate.

A.   I understand what mitigate means. To lessen; to make better.

Q.   Yeah.  Do you believe an owner of a plane has an obligation to try to mitigate the damages to the plane once the damage occurs?

MR. CLAYMAN:

Objection to form.

You can answer, Mr. Bransky, if you're able to.

THE WITNESS:

An obligation to make better, I

would -- in what sense?  I mean, like finding the best repair station or --

EXAMINATION BY MR. HANNA:

Q.   Do they have an obligation to try to lessen their damage?

A.   After it's already occurred or before it occurs?

Q.   After it occurs.

A.   (No response.)

Q.   Let me give you an example.

MR. CLAYMAN:

Objection.

You can answer if you are able to.

EXAMINATION BY MR. HANNA:

Q.   Let me give you a nonaircraft example.  Roof suffers severe damage in a hurricane and the owner takes no steps to tarp it, to cover it, to protect the roof further, and the property suffers further damage.  We say that under that circumstance, the owner failed to mitigate his damages.  He didn't take steps to try to lessen the extent of the damage.

My corollary in the aircraft world, as an appraisal expert, do you believe it's

incumbent upon an owner to try to mitigate their damages if they suffer damages to an aircraft?

MR. CLAYMAN:

Object to form.

You can answer if you are able to, Mr. Bransky.

THE WITNESS:

Operation of an aircraft is highly regulated.

If by mitigating it -- There's only one way to operate an aircraft and that's in accordance with proper methods and procedures. So to -- If an aircraft is damaged, to mitigate making things worse -- like maybe if you have a gaping hole, park it -- it makes common sense.

MR. CLAYMAN:

Is everyone still there?

COURT REPORTER:

Wait a minute. Hold on. You froze up for a minute, at least for me, and so can you go back? "If an aircraft is damaged, to mitigate making things worse -- like maybe if you have a gaping

hole" --

THE WITNESS:

So as far as mitigating damage, I would say it makes common sense because if you mitigate the damage, it's going to cost less to repair the damage. And so the responsibility in that case would be common sense. But is there a regulation that says, "The owner has to park an airplane inside the hangar that has a gaping hole that could allow rainwater in and cause corrosion" --

COURT REPORTER:

He froze up again on my end.

MR. HANNA:

Yeah.

Off the record.

(Whereupon a discussion was held off the record.)

THE WITNESS:

Can y'all hear me now?

MR. CLAYMAN:

Yes.

MR. HANNA:

Yes, we can.

THE WITNESS:

Okay.  And I apologize.  I'll try to talk -- Kathy, I'll try to talk slower.

Again, does an aircraft operator have an obligation to mitigate damage?  And I gave an example.

COURT REPORTER:

It's happening again.

MR. HANNA:

Off the record.

(Whereupon a discussion was held off the record.)

MR. HANNA:

Yeah.  Go ahead, Mr. Bransky.  Let's go back on the record.

EXAMINATION BY MR. HANNA:

Q.   And you were finishing your answer with regard to my questions about mitigation of damages.

A.   All right.  The answer is I believe it makes good operational sense to try to mitigate damage after damage has occurred so that the damage does not get worse.

Q.   Okay.  All right.  Let's turn to your report -- back to your report again.  And

I'm going to go back to page 29.

MR. HANNA:

(Puts document on the screen.)

EXAMINATION BY MR. HANNA:

Q.   And this is Diminution in Value Analysis:  Common Factors Aircraft Appraisers Consider.  (As read.)  Do you see that?

A.   I do.

Q.   Where is the source of these common factors?  Where did you get these common factors?

A.   I developed those.

Q.   So they're not from a secondary source, a textbook, or a publication that's been peer reviewed that says "These are the factors that appraisers should use in doing aircraft appraisal"?  These are just factors that you created; is that right?

A.   Well, these are the ones that I've written about and used for years, but I did put them into the textbook that I wrote a Damaged Aircraft, Diminution in Value section on.  And that was peer reviewed before it went into the textbook.

Q.   Who did the peer reviewing?  Do you

know?

    A.   The MTS Committee and the editor of the book itself.

    Q.   Okay.  Let's turn to page 30.  Now, we know from the Embraer records, Embraer's ETD2025-P300-05131551, that they described this repair classification as minor, but you've got the damage as moderate.  Why are you disagreeing with Embraer in stating that this is moderate damage when Embraer said it was minor?

    A.   Can we go to page 29?

    Q.   (Complies.)

    A.   A little higher?

    Q.   (Complies.)

    A.   Down a little bit.

    Q.   (Complies.)

    A.   Right there.

    So this is an appraisal for value, not airworthiness.  The FAA in that definition -- They're definitions that Mr. Dufour had in his report, come from the NTSB-830, and the FAA uses it for some -- for certain safety-related reasons.  But that's related to safety, airworthiness, and scrap and destroyed

aircraft.

This is an appraisal for value.  And the source definition for Diminution in Value, as it applies to damaged aircraft, is -- and that's the bottom paragraph there, is a form of economic obsolescence, external to the aircraft, that can be measured by the difference in value between an aircraft with damage history and an identical undamaged aircraft.  It is a measure of lost value related to market perception, not airworthiness.  (As read.)

And that's the critical sentence. We deal with market perception.

Q.   Okay.

A.   And so their determination that that's a minor repair for their maintenance facility.  It's not how the market as a whole of buyers view that type of repair.

Q.   Okay.  And so you would agree that the factors used in the damage analysis to determine for appraisal purposes that this is moderate damage have a great deal of subjectivity to them?

A.   Well --

Q. In other words, there could be differences of opinion about these factors that you have listed, Common Factor No. 1, Type and Extent of the Damage? (As read.)

Don't you agree?

A. I agree.

Q. Okay. And, of course, you used the number three which results in greater diminution, as opposed to if you move left on that scale all the way to the least diminution would be a minus five. You have this moderate damage as a three; correct?

A. Correct.

Q. Okay. Let's turn to page 31. This discusses the Method, Extent, and Quality of the Repair. And you felt that the repair was of excellent quality; correct? (As read.)

A. Correct.

Q. Now, you mention a number of things in this section on page 31 of your report about corrosion, corrosion and also fuel tanks that can get Biocidal, B-I-O-C-I-D-A-L, growth. You mention a number of things here that might happen at some point in the future, but it's speculative. Do you agree?

A.   I agree.

Q.   Okay.  Isn't it true that corrosion can happen in virtually any aircraft?

A.   Corrosion can happen in any aircraft and it does happen in all aircraft, from the beginning date until they retire in service.

Q.   Corrosion can happen in almost any parts of an aircraft; correct?

A.   Yes, that's correct.  Certain areas are more prone to corrosion, including the inside of the wings and fuel tanks.

Q.   Have you ever yourself cleaned jet fuel tanks on private jets?

A.   I have not.

Q.   And didn't you get this information from Mr. Quinn?

A.   Mr. Quinn and I had a long conversation about this and he put it in an e-mail to me, which I included in my work file.  Yes.

Q.   Okay.  So these are really findings that you adopted from Mr. Quinn and incorporated into your report; is that right?

A.   Well, they were findings that we discussed and then he came back and wanted to

clarify some questions we had talked about but also to continue on with the conversation. And I liked the way he worded it and I did include it in the report. But I do agree with it.

Q. But, again, there's no evidence that any of this is happening right now to your knowledge; right?

A. That's correct.

Q. This is just speculative as to something that may or may not happen in the future. We don't know with any degree of certainty at this time; right?

A. That's correct.

Q. Okay. Then I'm going to turn to page 34. Page 34 is Common Factor 5: How the Damage Repair was Recorded in the Maintenance Records. (As read.)

And you're suggesting that this should result in greater diminution in value because this damage repair entry is on the first page of the logbook, and so you say that that's going to result in a negative market perception; correct? (As read.)

A. A repair like this will result in a negative market perception and it is on the

first page of the Airframe Logbook.

Q. What is your basis for that opinion? Is there some source material or is there some peer-reviewed publication that supports the notion that you give a three-level greater diminution of value simply because there's a damage repair entry in a logbook?

A. Yes.

Q. What's the source of your opinion on this, other than just your own opinion?

A. Well, opinions are based on -- This opinion is based on my 34 years of damage aircraft appraisal work, my over 50 years of multi-discipline aviation experience, including aviation maintenance and aircraft brokering. And the ASA definition of Diminution in Value as it applies to damaged aircraft, along with the information provided to me in the specific facts.

Here we have a nearly new 14 to $15 million Phenom 300E with covert damage repair to the spar and internal fuel tank doublers in a market with sophisticated risk adverse buyers. That's huge. And that's why the -- It was an excellent repair, but the market does

not like repairs to the spar, and this type of repair, a savvy buyer or their adviser will note this.

Q. Okay. But, Mr. Bransky, help me understand what specific criteria suggests that this should be in Category 3 as opposed to Category 1 or a Category 5? What determines that it goes in No. 3?

A. It's my opinion, based on what I just said, my experience.

Q. Your Damage Analysis here --

MR. CLAYMAN:

Let him finish answering, Mark. I don't think he was finished.

MR. HANNA:

I'm sorry. Go ahead.

THE WITNESS:

Based on my experience -- Again, this is for valuation, not airworthiness. Based on my experience involved in aircraft maintenance and aircraft brokering, buyers of these types of aircraft don't -- they're -- they will see that and they -- Again, they're risk adverse. They don't like uncertainty or

the stigma of possible potential issues down the road.

EXAMINATION BY MR. HANNA:

Q. What are the factors that separate No. 2 from No. 3 in the Greater Diminution Scale?

A. How the -- The perception by the market, in my opinion, is going to be at three.

Q. Okay. So it's just you decide what numeric equivalent to give this based on your perception of how the market will receive this basically; right?

A. Based on my knowledge, background, experience, yes.

Q. Okay. Let's turn to page 35. This is the Sales Market for the Aircraft Type that Suffered the Damage; right? (As read.)

A. Correct.

Q. So you're saying that this has the least impact available, a minus five, on diminution of value; correct?

A. It mitigates the diminution, yes, most.

Q. And that's essentially because you considered the sales market for the Embraer

Phenom 300 healthy; is that right?

A. It's very health -- It was a very healthy market.

Q. Okay. And then I want to turn to this, page 36. Let's see if I can rotate it.

Now, this is a Weighted Diminution in Value Summary Matrix. (As read.)

Where did this come from?

A. I created that.

Q. Okay. You created it.

And this includes Items 1 through 6 that we've just gone over; right?

A. Right.

Q. Okay. And you note in here that -- Let's find my notes.

(Whereupon a pause occurred in the proceedings.)

EXAMINATION BY MR. HANNA:

Q. You note in here, Diminution in value opinions are not formula driven. There are simply too many unique factors and variables involved to fit neatly into a formula. (As read.) Is that right?

A. Correct.

Q. And do you stand by that today?

A.   I do.

Q.   So if you're not using a formula, then all these factors, one through six, are principally subjective opinion based on the appraiser; correct?

A.   Yes.  A diminution in value opinion is always going to be subjective and is always going to be an opinion.

Q.   And do any of these items, one through six, get any greater weight than the other or are they all weighted equally?

A.   Can you zoom out?

Q.   (Complies.)

A.   More.  Thank you.

So I put the weight on the right. And before I get into the weight, in that bottom paragraph, I put, The purpose of including this matrix is to help the reader of this report better understand the factors and thought process used in the Diminution in Value Analysis.  Diminution in value opinions are not formula driven.  There are simply too many unique factors and variables involved to neatly fit into a formula.  (As read.)

So I wanted the reader to

understand, when I developed my opinion of diminution, where I weighted each one of these different factors.

Q. Okay. But doesn't weighting each of the factors then create a formula?

A. No. It adds up to a hundred, but it shows how much importance I thought each of the factors. It's not a formula.

Q. So you don't believe that once you weight the factors, that by doing so you're creating a formula?

A. Unh-unh (indicating negatively). On the Undamaged Opinion of Value, the predamage opinion in my worksheet, I do weight the different type aircraft. That is a formula, but not here. This is, again, merely to show -- help the reader better understand the thought process used in this report.

Q. And the considerations and observations are your own?

A. Correct.

Q. Okay.

A. In other words, I took all the previous pages in that section and put them all in one matrix.

Q.   Before I forget, I'm going to attach -- Let me -- I'm going to attach the entirety of your report -- It looks like 61 pages -- Well, it looks like 58 pages with your letter as Exhibit 9.

Okay.   Let's go back to Part One of your Appraisal Report.   This is where you assess the value of the aircraft; right?

A.   Predamage.

Q.   Predamage.   And you came up with a valuation market value undamaged of $14,600,000; right?

A.   Right.

Q.   And then you've got Diminution of Value, $1,825,000; right?

A.   Right.

Q.   And then if you turn to page 9, your Definition of Market Value is footnoted as 12 CFR 34.42, paren, (g), end paren; is that right?   (As read.)

A.   Right.

Q.   And then you explain in here that you're not going to use the cost approach or the income approach.   You're going to use a sales comparison approach; correct?

A. Correct.

Q. And you say in your opinion that the income approach and the cost approach don't have any real basis for this aircraft. (As read.)

Why is that?

A. Well, they're not -- Well, first, it's not an income-producing -- If it was an income-producing tool for The Jones Company, I would need to see the entire -- all their records for that business to find out where the aircraft fit into that business. And would that really be something that I would feel comfortable doing as an aircraft appraiser? I would tell the client to hire an business appraiser if they wanted to use the income approach.

Q. Do you know whether the aircraft produced income or the plan was to have it produce income?

A. I know it's part of a business, but no, I don't.

Q. Now, you're aware that the sales price was approximately $10,800,000; correct?

A. Correct. I know -- Yes.

Q.   The fact that they bought the plane for $10,800,000, would that factor suggest that the cost approach should be considered and used in evaluating the preaccident value of the plane?

A.   No, it does not.

Q.   Why?

A.   Because that would undervalue it based on the market.  The market right now for that aircraft has gone up significantly.

Q.   Can you explain why the plane was sold to The Jones Company for 10,800,000?

A.   They bought the aircraft and paid for it -- or signed the contract for it years in advance.  And the market for that aircraft -- It became an in-demand aircraft and the market value, as shown in my spreadsheet under the sales -- The spreadsheet in the report is a little farther down.  It shows the comps that I used, as well as the subject aircraft.  All those comparable aircraft are selling for much more than what The Jones Company paid for the aircraft a few years earlier.

Q.   How do you know that they've locked in the price years before?

A.   That's what I was told by the client.

Q.   But you don't have any documents you produced as part of your expert reliance documents to show that, do you?

A.   No.  But I did include -- In the Paragraph C here, I just put down that the aircraft cost 10,800,000, but it's irrelevant because I didn't use it.

Q.   Did you see the sales transaction document?

A.   I did not.

Q.   Okay.  So the plane was purchased for $10,800,000 and essentially had nine days on it and you assigned a sales comparison value of $14,600,000; right?

A.   Based on comparison aircraft.

Q.   Yeah.  So it's -- Basically over nine days, it went up almost $4 million?

A.   It was worth more that month, before they took delivery of it.

Q.   Okay.  Let's turn to page 12.  The Embraer Phenom 300E Market.  (As read.)

Can you define that market?

A.   Define it in what sense?

Q. Well, where are these aircraft? Are these all aircraft that are owned by Embraer?

A. What aircraft are you referring to, sir? The ten I'm describing there?

Q. Yeah. On the effective date of this appraisal, there are ten Embraer Phenom 300E aircraft listed for sale out of an operation fleet of 334 aircraft. (As read.)

Are all of those being offered for sale directly by Embraer?

A. No. The Embraer -- No, they're not.

Q. So what is the source of finding ten Embraer listed for sale?

A. It's in the report, I believe, if you scroll down to --

Q. (Complies.)

A. A little farther.

Q. (Complies.)

A. So above -- That last one. I believe those are the ten I used. I --

Q. Okay. But where did you get this information?

A. There's various data sources out there.

Q. What were the sources that you

utilized to get the information about these aircraft?

A.   One of them would have been -- one called JetNet.  One would be called AircraftPost.

Q.   Okay.

A.   And there's also other data sources. I included those in the work file.

Q.   And then you detail your Sales Comparison Approach on page 13 of your report; right?

A.   Yes.

Q.   So in this analysis, did you include data for Embraers other than the five that you selected as your comparables?

A.   As far as using the data in the --

Q.   The data that's described in here in your Sales Comparison Approach.  Did you use data from any other Embraers other than the five comparables you ultimately used, which are listed here on page 16?

A.   No.  I -- Those are the strongest ones.  I used those.

Q.   Okay.  And you say in here that you did not yourself independently or objectively

examine these aircraft; right? (As read.)

A. The comparison aircraft?

Q. Yes.

A. That's correct.

Q. Okay. And if we turn to page 14, this suggests that the sales trend for an Embraer Phenom 300E resulted in an average price of $11,840,000; is that correct?

A. Yes. That is -- That includes all model years.

Q. Going back to when?

A. Well, if you scroll up --

Q. (Complies.)

Just going back to 2024?

A. No. That's for model years. I believe that goes back to 20 -- I don't have that exact information in front of me, but it's included in my work file.

Q. But this table, this chart, seems to only talk about 2024 and 2025. You'd agree?

A. No. That's for the Embraer 300 sales trends at all the --

Q. Yeah. But it's 2024 and 2025; right?

A. That's for time period. I'm talking

about model year of aircraft, not the time period.

Q.   I'm talking about the time period. So this is the time period, 2024-2025; right?

A.   Correct.

Q.   And so during that two-year period of time, the average sales price was $11,840,000; right?

A.   But that included the model year aircraft that were older as well as the 2024.

Q.   Well, then why did you include it in your chart if it -- And you say in here, The JetNet data below shows the sales and inventory of Phenom 300E aircraft, six months before and after the appraisal effective date.  (As read.)

You don't say this is an older aircraft or older models.  You say it's the Phenom 300E; right?

A.   Right.  Yeah.  It's just to show there was inventory and active buyer interest in that model.

Q.   And it showed the average sales price was $11,840,000?

A.   Well, it's an average.  You know, there's a range from 10,7 to 14,1.  That's

average over the year. It did increase quite a bit at the end of the year into the following year, 2025.

Q. And if we look at Table 15, which I'll try to rotate -- Table 15 has one, two, three, four, five, six, seven, eight -- nine aircraft?

A. Uh-huh. Yes.

Q. And only two of those aircraft have a sales price in excess of $14 million; right?

A. And those are the manufacture year 2024.

Q. Understood.

A. Which is the same as the subject aircraft.

Q. And then if we turn to page 16 -- Sorry. I'm going to have to rotate again.

These are your five comparables that you used and have incorporated into your report to form the basis for your Predamaged Market Value; correct?

A. Yes.

Q. And these are all Embraer Phenom 300s?

A. Phenom 300Es, correct.

Q. And they go back to 2022; right?

A. For the manufacture year, but they all sold within six months of the effective date.

Q. And did you try to include all relevant information on these comparables that you thought would be important for somebody to see to understand how you arrived at your conclusion?

A. I did. I include items of -- that would affect the value significantly adjusted for the subject aircraft.

Q. Okay. So are the make and model here exact matches with our 300 -- Phenom 300E?

A. It is a -- Yes. These are all Phenom 300Es. The same as the subject aircraft.

Q. And are all of these transactions within 90 days to six months?

A. I believe the market sale date was -- That is correct.

Q. Okay. And do all of these aircraft have the same configuration and customization?

A. That -- If you look at the passengers and interior, there is some

differences -- there are some differences.

Q. Okay. And what about maintenance, engine program type? One of these comparables has no program; right?

A. That's correct.

Q. Shouldn't comparables typically have similar maintenance program enrollment?

A. That's preferable, but in this case, that's the only aircraft where I made an adjustment for engine time for the buy-in down below, 742k.

Q. And do you remember your data sources?

A. For what?

Q. For this information for your comparables, where you got it?

A. It was a combination of JetNet and AircraftPost, and also calling brokers.

Q. So you did not use Aircraft Blue Book; correct?

A. Not for this, no.

Q. You did not use AMSTAT?

A. No.

Q. You did not use VREF?

A. No.

Q.   Did you consider modifications and upgrades in your comparables?

A.   No, I did not.  These are aircraft that are just a couple years old.  There was no notes on any of them about any upgrades.  Some of these aircraft are fairly low time.  But no, that was not part of the analysis, unless -- I did get a JetNet printout on each one, and where there would have been something that would significantly affect the opinion of value, I included it.

Q.   Did you consider any differences in airframe hours and landings?

A.   Yes.

Q.   Did you consider any differences in engine status?

A.   Well, the -- Except for Comp One, all the other ones were on engine programs, but from an appraisal -- as an appraiser, when we have aircraft that are on fully paid up engine programs, they're valued as if they're zero hours since new because the overhaul cost is prepaid.  Every hour the operator flies it, they put money towards the overhaul.  So for value purposes, it's considered to be zero time

engine, except for the first one.

Q.   Okay.

MR. HANNA:

Let's take a break.  Let me just look over my notes.  I might be done, but let's take a ten-minute break and then we'll come back and figure out if I have any more questions or if we're done.

MR. CLAYMAN:

Okay.  Sounds good.

MR. HANNA:

I'll stop sharing at this time.

(Whereupon a recess was taken.)

EXAMINATION BY MR. HANNA:

Q.   Mr. Bransky, I think I'm close to being done.

Do you know, does the FAA have a definition of a moderate repair that the FAA uses or publishes?

A.   No.  The FAA only defines a major or minor repair.

Q.   Okay.  So in this instance, you used the term "moderate" repair, and any definition of what that might be is what you decide it is in your report, what constitutes a moderate

repair; correct?

A.   I've included that in the Appendix of the report, the classifications of damage I used.

Q.   Okay.  And those are classifications that you have come up with; right?

A.   Well, I didn't originate them, but I've taken them from other sources and -- other appraisal organizations and I modified it over the many years I've been doing this.  Because -- For example, when I started off, some of the definitions did not even mention composite parts or aircraft repairs, and we had to add that to it and other things of that nature.

Q.   All right.

MR. HANNA:

Those are all the questions I have.  Thank you for your time today.

THE WITNESS:

Thank you.

MR. CLAYMAN:

I don't have any questions.  You're free to go, Keith.

MR. HANNA:

Off the record.

(Whereupon a discussion was held off the record.)

COURT REPORTER:

Jeff, would you like a copy of the deposition?

MR. CLAYMAN:

Yes, please.  E-trans is fine.

COURT REPORTER:

Thank you.

(Whereupon the deposition was concluded at 2:59 P.M.)

            *       *       *       *       *

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Kathy Ellsworth Shaw, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that KEITH M. BRANSKY, to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinabove set forth in the foregoing 106 pages; that this testimony was reported by me in stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter; I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

_____
KATHY ELLSWORTH SHAW, CCR, RPR
Certified Court Reporter
Registered Professional Reporter

**A**

**A-I-R-C-A-M** 23:10
**A&P** 11:6 18:9 22:10,12,15 24:16 24:19,22
**ability** 107:9
**able** 10:2 38:24 48:25 75:23 76:13 77:6
**above-mentioned** 5:3
**accept** 34:14
**accepted** 45:24 46:16 47:11
**accompanied** 107:2
**accreditation** 51:15 51:24 53:4
**Accredited** 50:9
**accurate** 7:13 10:20 10:21 69:20
**accurately** 44:25
**acknowledgements** 31:11
**acted** 107:13
**action** 1:5 24:23 25:5 50:3 70:13
**active** 56:4 99:20
**actively** 19:4,11,16 19:23 20:1,7,10 20:11,19 21:14 22:12
**actual** 107:15
**add** 48:8 53:12 105:13
**added** 26:10
**Additionally** 14:16
**address** 5:23,24 18:18 55:14 61:12
**adds** 91:6
**adjusted** 101:11
**adjustment** 29:22 102:10
**administered** 107:5
**administering** 4:21
**adopted** 84:22
**advance** 94:15
**adverse** 50:3 86:23 87:25
**adviser** 87:2
**advisory** 107:14
**Aerosecure** 33:9,22 33:23,24 34:11,19 40:19 47:17
**aerospace** 11:20 29:3
**affect** 101:11

103:10
**affidavit** 40:14,18 43:8
**affidavits** 3:15 43:11
**aforementioned** 4:4
**AFRICK** 1:7
**afternoon** 5:6
**ago** 19:18 23:21,23 39:8
**agree** 22:10 24:1,12 60:25 63:8,9 64:2 64:3,12,13 69:15 69:20,21,22 70:1 70:2 74:16 82:20 83:5,6,25 84:1 85:4 98:20
**agreed** 4:2
**ahead** 5:20 10:12 26:23 27:9 68:22 79:14 87:16
**air** 12:2,4,6 13:17 13:18 14:1,7 15:19 17:9 19:22 36:23 55:13
**Aircam** 17:5 23:9
**aircraft** 3:22 9:9,12 10:5 12:14,17,22 12:23,23 13:1,2,6 13:8,16,19,22,22 13:25 14:2,3,4,8 14:13,15,20,22 15:1,5,16,18,21 16:3,8,20,23,24 17:2,4,7,10,11 19:10 20:14 21:2 22:1,7,7,19,23 23:1,11,19 24:3,6 24:8,9,13 28:6,7 30:4,13,14,22,24 32:3,8 33:15,17 33:18,20 34:2,3 34:12,15 35:24 36:24,24 39:14,16 39:18 40:14 41:19 41:22 42:11,13 44:16 45:21 46:14 46:17 47:14,15 49:16,20,22 50:15 50:17 53:20 54:4 54:12,19,23 55:16 55:23 56:8,10,17 56:18 59:14 60:23 61:2,18 68:25 69:3,4,17,23 70:4 70:8,23,24 72:10 72:19 74:1,16,17

74:19 75:2 76:24 77:3,9,12,14,23 79:4 80:6,17,22 82:1,4,7,8,10 84:3 84:4,5,8 86:13,15 86:17 87:21,21,23 88:16 91:15 92:8 93:4,12,14,18 94:10,13,15,16,20 94:21,23 95:8,17 96:1,2,3,7,8 97:2 98:1,2 99:1,10,14 99:17 100:7,9,15 101:12,17,22 102:9,19 103:3,6 103:20 105:13
**aircraft's** 58:24 59:1,12 71:15
**AircraftPost** 97:5 102:18
**airframe** 11:3 18:2 86:1 103:13
**airline** 12:2,25
**airlines** 9:11 12:8 14:5
**airmen** 18:13
**airplane** 21:8 23:5,6 46:25 55:10 61:12 61:14 78:10
**airplanes** 20:25
**airport** 14:20 19:9 20:22 41:17,18 42:6,10 61:8
**airworthiness** 71:2 71:21 72:3,9 73:1 81:20,25 82:12 87:19
**akin** 20:2
**all-encompassing** 11:18
**allow** 9:2 11:15 35:7 78:11
**allowed** 11:9 38:18 39:9 47:12
**allows** 11:18 19:25
**alteration** 22:1
**American** 27:13 30:2 31:5 50:6,9 51:14 52:6,21
**amount** 21:3
**AMSTAT** 102:22
**analysis** 80:6 82:21 87:11 90:21 97:13 103:7
**angles** 73:6
**annual** 20:15
**answer** 4:14 7:9,13

7:15 8:5,19,21,24 8:25 9:3 55:11 75:22 76:13 77:6 79:17,20
**answering** 87:13
**answers** 7:8
**anticipate** 8:10
**apart** 45:3
**apologize** 79:2
**apparently** 27:25
**APPEARANCES** 1:14
**appears** 69:24
**Appendix** 105:2
**Applied** 10:18
**applies** 28:6 82:4 86:17
**appraisal** 6:9 9:12 9:14,17 10:5 26:14 30:16,22 32:9 34:1,12,15 35:1,9 41:25 46:24 47:14,24 50:22 52:18 53:1 54:9 59:9,24,25 60:14 74:16 76:25 80:17 81:19 82:2 82:22 86:13 92:7 96:6 99:15 103:19 105:9
**appraisals** 48:6 50:21
**Appraised** 53:20 54:5
**appraiser** 9:9 16:8 45:22 50:9,13,15 75:1 90:5 93:14 93:16 103:19
**appraisers** 27:13 30:3 31:5 50:6,10 51:15 52:7,17,21 80:6,16
**Appraising** 30:9,24 32:12
**appreciate** 15:23
**approach** 92:23,24 92:25 93:3,3,17 94:3 97:10,18
**appropriate** 7:17
**approved** 53:13
**approximately** 48:3 93:24
**April** 64:14,23
**area** 30:16 64:25
**areas** 59:18 84:9
**Arizona** 33:11 34:24 40:15 47:21

**arrangement** 107:11
**arrangements** 107:12
**arrival** 61:18
**arrived** 101:8
**art** 20:7
**article** 28:5,19 29:4 29:20 107:14
**articles** 27:22 28:8
**ASA** 3:12 50:13,16 50:17,20,23 52:24 86:16
**ASA's** 28:5
**aside** 73:22
**asked** 28:1 29:4 39:25 58:23 59:5 59:11,14
**asking** 51:13 66:14 73:20,21,22
**assess** 92:8
**assessing** 29:21
**assets** 30:10 32:12 46:23
**assigned** 95:15
**associate** 10:18 11:1
**associated** 71:22
**association** 14:23 28:20 29:2,13,13
**assume** 37:3
**ATA** 70:17
**Atlanta** 1:11 5:25 36:17
**attach** 32:22 33:1,6 58:2 65:12 68:23 92:1,2
**attain** 50:8
**attaining** 51:16
**attended** 40:23
**attorney** 34:22,23 37:4 38:9 40:6,10
**attorneys** 1:18,22 34:18
**August** 38:13
**Augusta** 46:5
**author** 31:21,23,25 32:17
**authored** 3:13 5:13 27:2 30:5
**authoritative** 27:14 30:3 32:8
**authority** 107:6
**Authorization** 18:20 22:16 24:2 24:7 25:1
**authors** 31:9
**available** 66:5 88:20

**average** 98:7 99:7
99:22,24 100:1
**aviation** 1:8 5:8
10:16,19 11:12,13
11:20,22 12:15,17
12:21,25 16:1,8
28:20,25 29:1,3
29:11,12,14,17
61:24 65:6 86:14
86:15
**aviation-specific**
28:2
**Avoid** 7:17
**aware** 18:15 38:2,4
38:7,12 93:23
**awhile** 6:24

**B**

**B** 3:7 65:23
**B-I-O-C-I-D-A-L**
83:22
**Bachelor** 10:15
11:15
**bachelor's** 11:13,17
**Bachelors's** 11:11
**back** 6:18 42:20
44:13 46:6 48:22
51:11 55:10,22,25
56:3 64:10 65:16
71:5 77:23 79:15
79:25 80:1 84:25
92:6 98:11,14,16
101:1 104:7
**backed** 42:12
**background** 5:18
88:13
**balance** 71:16
**barrel** 42:15
**based** 20:13 60:25
69:5 86:11,12
87:9,18,20 88:10
88:13 90:4 94:9
95:17
**basically** 10:9 16:6
27:22 88:12 95:18
**basis** 86:2 93:4
100:20
**basket** 73:24
**Bates** 3:18,20,23
62:21 64:17 65:13
67:6 69:23
**Bear** 58:6
**bears** 67:4
**Becker** 60:3
**BECKMAN** 1:15
**beginning** 68:3 84:6
**behalf** 5:9

**believe** 6:7,23 26:20
44:11,12,17,19
45:17 46:5 47:5
47:19 54:10 57:11
57:17,24 75:1,17
76:25 79:20 91:9
96:14,20 98:16
101:20
**Bell** 36:17
**best** 44:14 46:10
76:2 107:9
**better** 75:16,25
90:19 91:17
**Binder** 28:19,23
29:16
**Biocidal** 83:22
**bit** 15:9,11,13 19:17
35:16 73:7 81:16
100:2
**BLAND** 1:19
**Blue** 102:19
**board** 107:11,15
**boats** 30:18
**Boeing** 55:18
**Boeings** 54:19
**book** 30:15 31:5
81:3 102:20
**bottom** 10:8 26:16
82:5 90:17
**bought** 94:1,13
**BRACKETT** 1:20
**Bransky** 1:11 3:12
3:14,24 5:1,6,22
6:20 8:17 10:5
51:13 57:1 63:16
67:1,6,9 68:3
69:24 73:11,20
75:22 77:7 79:14
87:4 104:15 107:5
**Bransky's** 3:9,10
**Bransky-SDT_242**
64:2
**Bransky-SDT_60**
64:22
**Bransky-SDT_90**
62:23
**Bransky-SDT_92**
64:20
**Bransky-STD_207**
3:23 69:12
**Bransky-STD_674**
3:21
**Bransky-STD_90**
3:19 65:14
**break** 7:11,23,24
8:1,3,5 51:2,5,6
104:4,6

**breaking** 51:1
**bring** 8:6
**broker** 56:8,11,18
**brokering** 86:15
87:22
**brokers** 102:18
**building** 23:6
**built** 16:23 17:6
23:5
**business** 5:23,24
93:11,12,15,21
**buy-in** 102:10
**buyer** 87:2 99:20
**buyers** 82:19 86:24
87:22

**C**

**C** 95:7
**C.V** 3:9,10 9:23
10:2,10 12:13
15:6 16:17 23:25
25:14,23 26:4,13
26:24,24 49:10
**Cady** 58:15
**calendar** 72:22
**call** 72:7 73:18
**called** 12:7 15:19
17:5,8 23:9 37:23
57:3 97:4,4
**calling** 102:18
**calls** 48:9
**capacity** 21:25
45:18
**captioned** 60:14
68:3
**car** 42:8
**Carbondale** 12:3
13:17
**card** 21:11
**care** 69:19
**career** 6:9 11:14
**carrier** 13:18
**carriers** 14:1
**case** 5:14 25:25
33:14,15 34:2,18
35:9,14,18 36:12
36:14 37:18,25
38:17 39:6,13
40:1,4,17,20 41:2
41:4,8,11 42:1,4
43:8,14,14,17
45:10,15,19 46:18
46:20,22 47:17
58:19 64:1 72:8
73:21 78:7 102:8
**cases** 38:7
**Category** 87:6,7,7

**cause** 78:12
**caused** 70:5
**CCR** 2:6 107:22
**certain** 14:18 69:16
72:21 81:23 84:9
**certainly** 7:7 8:2
38:25
**certainty** 85:12
**certificate** 18:3,14
22:5 26:10,12
107:1
**certificates** 49:23
**certification** 4:11
19:25 24:16,19,22
53:3 107:2
**certifications** 26:9
48:23 49:8,11
50:1
**Certified** 2:7 4:19
5:3 107:3,22
**certify** 107:5
**Cessnas** 17:6,6
**CFR** 92:19
**challenge** 38:8
**challenging** 8:14
**change** 18:18 55:14
71:14
**changed** 26:7
**changes** 28:3
**chapter** 30:5,16,17
30:21,21,23 32:5
**chapters** 30:19
**chart** 98:19 99:12
**charter** 12:24
**checked** 49:17
55:23
**Chief** 58:16
**Christopher** 65:5
**chronology** 15:25
**circumstance** 76:20
**Cirrus** 40:24 43:14
**Civil** 1:5 4:6 107:14
**clarification** 26:21
**clarify** 22:20 35:16
85:1
**classification** 67:24
81:7
**classifications**
105:3,5
**classify** 61:5
**Clayman** 1:16 6:8
50:25 51:7 57:22
62:20,24 64:16
74:20 75:5,20
76:11 77:4,18
78:22 87:12 104:9
105:21 106:6

**cleaned** 84:12
**clear** 26:8 29:8
**client** 93:15 95:2
**close** 42:10 104:15
**Cobb** 1:11 5:24
47:4
**cockpit** 39:18
**Code** 107:14
**collaborate** 32:13
**collect** 8:17
**combination** 102:17
**come** 53:15 81:22
89:8 104:7 105:6
**comes** 22:21
**comfortable** 93:14
**coming** 39:19 54:24
**Commemorative**
15:19 17:9 19:22
**commencing** 1:12
**commercial** 12:11
**Committee** 81:2
**common** 77:17 78:4
78:8 80:6,9,10
83:3 85:15
**Comp** 103:17
**companies** 48:9
**company** 1:5 5:10
12:7 34:13 37:10
41:14 46:12 56:10
56:14 58:16,20
66:1 68:20 93:9
94:12,22
**comparable** 94:21
**comparables** 97:15
97:20 100:18
101:6 102:3,6,16
103:2
**compared** 13:22
26:4
**comparison** 92:25
95:15,17 97:10,18
98:2
**complete** 33:3
107:11
**completed** 62:6
73:5
**completely** 32:5
73:23
**compliance** 107:10
107:13
**compliant** 57:25
**Complies** 15:10,12
15:14 26:17 81:13
81:15,17 90:13
96:16,18 98:13
**Comply** 70:14
**composite** 39:22

105:12
**comps** 94:19
**concern** 39:1 70:5
**conclude** 8:23
**concluded** 106:11
**conclusion** 101:9
**confidential** 37:12
37:13,15 38:20
**confidentiality** 39:3
**configuration**
101:23
**confusing** 7:10
**consider** 7:3 80:7
103:1,12,15
**considerations**
91:19
**considered** 72:23
88:25 94:3 103:25
**constitute** 12:21
61:2
**constitutes** 104:25
**construction** 30:20
**construe** 20:1
**contend** 22:4
**content** 28:16 57:8
**contents** 38:24
**context** 72:9
**continue** 11:8,10
85:2
**continuing** 20:16
52:13 71:20 72:3
**contract** 54:25
94:14
**contractual** 107:13
107:15
**contributing** 31:23
31:25
**conversation** 8:7
84:18 85:2
**copies** 44:17
**copy** 31:12 37:6
106:4
**corollary** 76:24
**Corporation** 9:14
9:17 47:25
**correct** 10:10,11
11:23 12:1,12
14:11,14 15:6
16:9,17,18 17:15
17:16,19,20,23,25
18:23 20:9 22:9
22:16,17 23:3,13
27:23,24 28:21,22
29:23,25 30:1,6,7
30:11 31:2,3,6,20
31:22 32:19,21
37:10 40:5 41:9

43:9,18 44:3,23
45:11 47:2 54:7
54:13,14,16,21
55:5,8,25 58:17
58:18,21 59:16,20
60:7,8,11,17,18
61:12,13,16 62:8
62:9 63:14,21,23
65:3,4,8,10,11,24
65:25 66:2,10
68:4,5,7,8,11,12
68:15,16,20,21
69:1,2,5,6 71:1,17
71:24 72:4,9 73:3
73:11,13 83:12,13
83:17,18 84:8,9
85:8,13,23 88:18
88:21 89:24 90:5
91:21 92:25 93:1
93:24,25 98:4,8
99:5 100:21,25
101:21 102:5,20
105:1 107:9
**Corrective** 70:13
**corrosion** 78:12
83:21,21 84:2,4,7
84:10
**cost** 78:6 92:23 93:3
94:3 95:8 103:22
**counsel** 4:3 37:10
107:19
**County** 47:4
**couple** 7:2 53:18
57:23 103:4
**course** 48:2 53:16
53:17,17 83:7
**courses** 11:11 50:16
53:14
**coursework** 52:25
**court** 1:1 2:7 4:20
5:3 8:14 33:10,12
33:13 34:14 35:19
37:16 45:24 46:2
46:3 47:3,11,18
47:20,21 59:19
77:20 78:13 79:7
106:3,8 107:3,16
107:22
**courts** 43:12
**cover** 76:18
**covered** 37:15
**covers** 15:17
**covert** 86:21
**cracking** 62:3 65:1
65:7
**crash** 46:17
**create** 91:5

**created** 39:20 80:18
89:9,10
**creating** 91:11
**credential** 52:19,20
52:23
**credits** 52:13,14
**criteria** 87:5
**critical** 82:13
**current** 22:11,11
47:24 49:12,13
55:16 61:21 62:18
64:5,24
**Currently** 9:9
**curriculum** 25:9
**curriculums** 10:23
**customization**
101:23

---

**D**

**D** 3:1,7
**D-A-U-B-E-R-T**
37:23
**D/B/A** 1:8
**DA-20** 17:6
**damage** 34:4,5
42:14,18,21,25
44:16 60:19,22
61:1,2,5,12 62:4
65:22 71:13 74:19
74:19 75:4,19
76:5,16,19,23
78:3,5,6 79:5,22
79:22,23 81:8,10
82:9,21,23 83:4
83:12 85:16,20
86:7,12,21 87:11
88:17 105:3
**damaged** 28:5,7
30:4,24 32:3 34:3
35:12,24 38:14
39:22 40:14,23
41:19 77:15,24
80:21 82:4 86:17
**damages** 75:3,19
76:21 77:2,2
79:19
**data** 96:23 97:7,14
97:16,17,19 99:13
102:12
**date** 18:14 26:19
33:3 60:16 72:22
84:6 96:5 99:15
101:4,20
**dated** 3:10,24 26:24
63:7,16 64:6,23
**Daubert** 37:23 38:8
**day** 1:12

**days** 13:25 95:14,19
101:19
**deal** 27:23 29:15
50:17 69:19 82:14
82:23
**dealing** 48:6
**dealings** 56:13
**deals** 29:14,16
30:15,22
**December** 60:16
**deceptive** 18:5
**decide** 88:9 104:24
**defendant** 1:22
33:24 35:15,20
36:12 38:17,22
39:5,11 40:17
41:11,12,14,15,16
46:9,12
**defendants** 47:9
**defending** 34:18
**defense** 37:4 40:6
40:10 43:24 44:2
44:6,21 48:14
**define** 95:24,25
**defined** 7:11 107:14
**defines** 104:20
**definition** 28:5
75:13 81:20 82:3
86:16 92:18
104:18,23
**definitions** 81:21
105:12
**deformation** 73:8
**degree** 11:18 85:11
**degrees** 10:25
**delivery** 95:21
**Delta** 12:3,7
**depends** 24:4
**deposed** 6:4 42:17
44:2,9
**deposition** 1:11
3:17 4:4,16 5:12
6:2,25 7:3,25 8:7
34:9 35:11,24
37:1,4,7 38:14
40:7 41:6,6 44:25
56:22 57:2,14,20
59:22 106:5,10
107:12
**depositions** 37:14
44:11,18
**describe** 13:21
**described** 68:17
81:6 97:17
**describes** 67:23
**describing** 96:4
**description** 61:1

63:17
**designated** 70:25
**designation** 52:25
**desire** 11:19
**desk** 54:21
**destroyed** 46:15
81:25
**detail** 68:10 97:9
**detailed** 59:10
**determination**
20:12 61:11 82:16
**determine** 82:22
**determines** 87:7
**develop** 58:24 59:11
**developed** 80:12
91:1
**Diamond** 17:6
**difference** 10:24
13:21 25:14 82:8
**differences** 83:2
102:1,1 103:12,15
**different** 8:12 10:23
23:11 25:12 26:1
26:3 30:16 42:23
55:9 91:3,15
**diminution** 27:23
28:6 29:18 30:4
30:25 32:3 34:5
35:8 40:2,15 43:1
59:1,13 60:15
80:5,22 82:3 83:9
83:10 85:19 86:6
86:16 88:5,21,22
89:7,19 90:6,20
90:21 91:2 92:14
**direct** 107:16
**direction** 107:8
**directly** 58:20 96:10
**disagreeing** 81:9
**disciplinary** 24:23
25:5
**discipline** 50:3
**Disclosers** 25:10
**Disclosure** 26:23
**Disclosures** 25:25
**discuss** 65:21
**discussed** 84:25
**discusses** 83:15
**discussion** 6:15
78:18 79:11 106:1
**disintegrated** 36:21
**dispatching** 49:22
**Disposition** 68:4,6
**district** 1:1,2,6
18:20
**Division** 46:23
**divorce** 47:1

document 3:12,14 3:20,22 9:25 25:21 27:4,7 49:4 54:2 56:24 58:12 62:15 65:19 66:23 66:25 67:4,10,15 67:17,20 68:2,18 68:23 69:10 70:16 71:9 80:3 95:11
documented 21:5,5 21:10
documents 3:18 6:7 57:4,22 59:23 62:13 63:25 66:6 69:13 95:3,5
doing 7:16 9:11 48:4 80:16 91:10 93:14 105:10
door 42:16
doublers 86:22
drive 42:9
driven 89:20 90:22
Dufour 31:18,19 32:14 60:6 81:21
duly 5:2 107:6

**E**

E 1:20 3:1,1,7,7
e-mail 84:19
E-trans 106:7
EAA 14:19,21,22 15:17
earlier 46:15 94:23
Early 47:7
earn 11:3
EASTERN 1:2
economic 82:6
Eddy 61:21 62:17 64:5,24
edit 32:4
edition 31:2,9,12,22 31:24 32:1,14,16 32:18,21
editions 31:4
editor 81:2
education 10:14 20:16 52:13
EEJS 61:18
effective 60:16 96:5 99:15 101:3
eight 100:6
eight-hour 20:15
either 45:17 52:13
electrical 39:20
electricity 39:24
Ellsworth 2:6 4:19 107:3,22

Embraer 3:20 17:14,18,22 23:12 53:22 54:6,9,12 56:18 61:8,9 66:7 66:9 67:3,14,19 68:2,20 70:1,14 73:22,23,25 81:5 81:9,10 88:25 95:23 96:2,6,10 96:11,13 98:7,21 100:23
Embraer's 81:5
Embraers 97:14,19
emergency 8:2
employee 69:25
employees 9:16
employment 15:5 107:15
ended 36:20 42:11
engaged 19:4,11,16 19:24 20:2,7,10 20:11,19 21:15 22:12 41:1,14
engine 13:12 33:18 36:16 102:3,10 103:16,18,20 104:1
engineer 49:19,21
engines 13:10,11 14:6
enrollment 102:7
entered 43:12
entire 6:9 65:23 93:10
entirety 92:2
entitled 3:12,14,22
entity 107:12
entries 27:12 41:5 43:16 70:10
entry 27:12 35:21 42:16 43:13 67:16 70:11,12 85:20 86:7
equally 90:11
equipment 30:9,20 30:20 32:11
equivalent 88:10
era 15:22
errors 28:15
Esquire 1:16,20
essentially 10:23 11:24 25:11 65:9 67:12 88:24 95:14
establish 19:13
ETD2025-P300-0... 70:15
ETD2025-P300-0...

64:25 67:5 81:6
ethics 50:19
evaluate 61:10
evaluating 94:4
evaluations 61:15 61:19
Event 60:19,22 62:4 71:13
evidence 4:17 85:5
exact 36:4 48:21 98:17 101:14
exam 50:18,19
examination 3:5 5:5 6:19 10:1 25:22 27:5 49:7 50:19 50:24 51:12 54:3 56:25 58:13 62:16 63:1 64:21 65:20 66:24 69:11 71:10 74:25 75:12 76:3 76:14 79:16 80:4 88:3 89:18 104:14
examine 98:1
examined 5:4
example 49:20 76:10,16 79:6 105:11
exams 52:25
excellent 83:17 86:25
excess 100:10
exclude 37:24
executive 21:25
Exhibit 3:8,10,12 3:14,16,18,20,22 3:24 10:13 25:15 26:5,24 27:10 32:23 33:6 49:10 57:4 58:2 65:13 68:23 70:17 71:4 92:5
experience 14:12 15:24 16:3,16 17:22 50:6,14 54:12,16 73:15 86:14 87:10,18,20 88:14
experimental 15:15 17:4,7 22:7
expert 5:9 16:8 25:10,24 26:23 34:12,15 35:1 41:1 44:22 45:25 47:12 59:15 60:7 76:25 95:4
expire 49:14,24 55:12 56:2

explain 92:22 94:11
Express 12:8
extensive 69:5
extent 27:17 42:25 74:18 76:22 83:4 83:15
external 14:22 82:6
externally 73:6

**F**

FAA 18:6,11 19:15 19:24 20:9,10 21:17 55:15 69:15 70:8 81:20,22 104:17,18,20
FAA-approved 18:2
facility 82:18
fact 54:15 94:1
factor 83:3 85:15 94:2
factors 80:6,10,11 80:16,17 82:21 83:2 88:4 89:21 90:3,19,23 91:3,5 91:8,10
facts 39:13 42:3 86:19
failed 76:21
faintly 67:7
fair 13:3,4 14:25 15:2 17:13,17 58:1
fairly 103:6
familiar 57:5,8 66:8
far 7:16 12:16,21 13:18 16:2,25 17:24 21:3 26:15 35:14 39:1 78:3 97:16
farm 30:19
farther 94:19 96:17
fashion 22:23
fault 46:19
February 1:12 6:23 64:6
federal 4:5 33:12
feel 93:13
feet 20:23
felt 83:16
ferried 61:7
field 11:20
figure 48:17 104:7
file 84:19 97:8 98:18
filed 35:19
files 34:20 35:5 36:9

filing 4:10
final 50:24
financial 48:7 107:12
financing 48:7
find 7:10 38:18 47:10 89:15 93:11
finding 76:2 96:12
findings 84:21,24
fine 70:9 106:7
finish 87:13
finished 87:14
finishing 79:17
firm 107:16
first 5:2 6:22 7:4 11:1 19:18 27:24 27:24 51:20 54:8 60:13 67:23 85:21 86:1 93:7 104:1
fit 89:22 90:24 93:12
fits 28:16
five 6:6,8,12 16:19 16:22 17:3,15 50:14,21 52:4 53:6 83:11 88:20 97:14,20 100:6,18
five-minute 51:2,4
five-year 48:20
fixed-base 12:17 39:14
flames 39:19
fleet 96:8
flew 12:7 36:22
flies 103:23
flight 10:9 26:10,12 49:19,21
FLIGHTLANCE 1:7
flip 8:16
Florida 40:24 61:24
flown 49:14,16
fly 55:10,18 56:1,5
flying 12:11 55:7
folks 19:19
follow 70:13
following 68:18 100:2
follows 5:4
footnoted 92:18
for-schedule 14:1
force 15:19 17:9 19:22 42:14
forced 42:13
foregoing 107:7
foreword 31:10
forget 92:1

**form** 4:13 22:22 74:21 75:21 77:5 82:5 100:20
**formalities** 4:8,10
**format** 107:10
**formula** 89:20,23 90:2,22,24 91:5,8 91:11,15
**forth** 57:14 107:6
**four** 6:11 11:12 26:22 27:12 33:4 43:16 45:1,4 100:6
**fourth** 58:23
**free** 105:23
**Frequency** 61:21
**Frequently** 64:24
**Friday** 57:23,23
**front** 36:10 98:17
**froze** 77:21 78:14
**FSDO** 20:12
**fuel** 23:16,19 83:21 84:11,13 86:22
**full** 5:20 20:2,7
**full-time** 9:11 11:10 11:25 14:25 19:2 19:13,16 50:14
**fully** 103:20
**Fundamentals** 30:9 32:11
**further** 25:23 76:18 76:19
**fuselage** 42:15
**future** 83:24 85:11

———————
**G**
———————
**g** 92:19
**gaping** 77:16,25 78:11
**general** 12:16,21 38:5 58:22
**generally** 12:25 37:14 66:14 73:22
**generated** 29:21 67:13
**gentlemen** 60:1
**Georgia** 1:11 5:25 35:12,25 38:14 46:3,4 47:4
**give** 7:13 14:17 34:9 35:7 38:19 40:2 57:21 75:13 76:10 76:15 86:5 88:10
**given** 6:1,25 60:4
**gives** 63:20
**giving** 37:24 46:24
**globo** 65:13

**go** 5:20 6:14,18 10:12 11:19 18:11 26:23 27:9 33:5 34:20 35:5,11 36:8 39:8 42:20 44:13 46:6 55:9 55:10,19,22,25 56:3 65:16 67:8 68:22 71:4 73:4 77:23 79:14,15 80:1 81:12 87:16 92:6 101:1 105:23
**goes** 10:8 87:8 98:16
**going** 5:11,17 7:2 9:22 10:12 23:24 25:7 27:1,9 31:18 32:22,24 33:1,5,6 38:23 39:2 48:23 50:12 54:24 56:3 56:20,21 58:1,3 58:10 59:25 60:12 62:10,12 63:15 64:4 65:12,15,16 65:17 68:22 69:7 71:3,4,6 74:14 75:8 78:5 80:1 85:14,22 88:8 90:7,8 92:1,2,23 92:24 98:11,14 100:17
**good** 5:6 19:9 51:1 65:9 70:6,10 79:21 104:10
**Gotcha** 62:25
**great** 9:7 69:19 82:23
**greater** 83:8 85:19 86:5 88:5 90:10
**gross** 14:2
**ground** 39:15,19 42:14
**group** 29:15
**groups** 14:18
**growth** 83:22
**guess** 7:6,7 29:6
**guidelines** 107:10

———————
**H**
———————
**H** 3:7
**habits** 8:7
**half** 48:19,19,20,20
**hands-on** 55:3
**handwritten** 63:17
**hangar** 17:11 20:22 22:8 78:10
**Hanna** 1:20 3:5 5:5

5:7 6:13,17,19 9:24 10:1 25:20 25:22 27:3,5 49:3 49:7 51:3,10,12 54:1,3 56:23,25 58:5,9,13 62:14 62:16,22 63:1 64:19,21 65:18,20 66:22,24 69:9,11 71:8,10 74:25 75:12 76:3,14 78:15,24 79:9,13 79:16 80:2,4 87:15 88:3 89:18 104:3,11,14 105:16,24
**happen** 72:14 83:24 84:3,4,5,7 85:10
**happened** 38:3
**happening** 79:8 85:6
**happens** 8:24
**happy** 7:12
**head** 7:18
**health** 89:2
**healthy** 89:1,3
**hear** 78:21
**heard** 7:1
**heat** 39:21
**heavily** 28:25 29:9
**held** 6:15 16:1 78:18 79:11 106:1
**helicopter** 36:17,18 36:21,22
**help** 87:4 90:18 91:17
**helped** 32:4
**helpful** 26:16
**hereinabove** 107:6
**hereto** 4:3
**HFEC** 61:21
**High** 61:20 64:24
**higher** 15:11,13 81:14
**Highlander** 17:8
**highly** 77:9
**hire** 93:15
**history** 20:13 82:9
**Hold** 77:21
**hole** 77:16 78:1,11
**Holly** 12:15 13:14 13:23
**HondaJet** 38:14 39:6,23 42:5
**Hopkins** 33:8,22 35:2 40:19 45:10 45:14 47:16

**hour** 103:23
**hours** 10:9 52:12 72:22 103:13,22
**hub** 54:24
**huge** 86:24
**hundred** 26:22 29:2 52:12 91:6
**hurricane** 76:17

———————
**I**
———————
**IA** 22:11,16 24:11
**IA's** 19:25
**ICA** 72:20
**ICAs** 71:21
**idea** 48:18
**identical** 82:9
**IGI** 26:11,11
**II** 15:22 41:6
**Illinois** 10:17,20 11:2 12:2,6 13:17 14:8
**immediately** 46:17
**impact** 88:20
**importance** 91:7
**important** 101:7
**in-demand** 94:16
**In-globo** 3:18
**include** 27:11 60:5 67:15 85:3 95:6 97:13 99:11 101:5 101:10
**included** 19:23 25:10 26:13 84:19 97:8 98:18 99:9 103:11 105:2
**includes** 67:18 89:11 98:9
**including** 29:18 59:24 84:10 86:14 90:18
**income** 92:24 93:3 93:16,19,20
**income-producing** 93:8,9
**incorporated** 84:23 100:19
**increase** 100:1
**incumbent** 77:1
**independently** 97:25
**indicated** 70:22
**indicates** 13:15 58:14
**indicating** 91:12
**indication** 65:7
**indications** 62:7 63:10,19 64:7,11

**indirect** 107:16
**individual** 11:19 41:18
**industry** 16:2 29:22
**inexperienced** 36:19
**information** 5:18 21:18 35:6,13 36:4,10 37:12 39:9 48:16 60:6 84:15 86:18 96:22 97:1 98:17 101:6 102:15
**informed** 107:11
**initially** 18:9
**inquiry** 18:13
**inside** 30:23 78:10 84:11
**inspection** 18:20 22:16 24:2,6,25 62:8,18 63:11,20 64:6,8,24 65:3 72:21
**inspections** 61:15 61:20,23 65:2 71:19 72:2,6,13 72:25 73:17 74:2 74:6
**inspector** 63:25 65:6
**install** 22:23
**instance** 104:22
**institutions** 48:8
**instructions** 71:20 72:3 73:1
**Instructor** 26:11,12
**insurance** 28:20,24 29:1,3,10,13,14 29:17,17,22 34:13 41:14 48:9
**interest** 65:1 99:20
**interested** 107:19
**interior** 101:25
**internal** 86:22
**inventory** 99:13,20
**investigating** 62:2
**invisible** 73:6
**involve** 33:14
**involved** 12:24 14:19 15:20 32:15 32:20 33:15 46:14 48:10 87:20 89:22 90:23
**involvement** 20:14
**involves** 47:25
**irrelevant** 95:8
**issue** 18:14,17 41:25

72:18
**issued** 18:3,21,24
  53:6,9
**issues** 29:4,10,11,15
  29:17,17 30:18
  62:3 70:10 88:1
**items** 89:11 90:9
  101:10

_____
**J**
**J106** 5:25
**James** 60:3
**JANIS** 1:8
**January** 3:10 26:19
  26:25 33:8 47:17
  49:10 53:19 61:20
  63:7,7,16 64:11
**Jeff** 106:4
**Jeffrey** 1:16
**jet** 9:13,17 13:12
  14:6,8 17:18
  40:24 43:14 47:24
  54:12,18,19 55:4
  68:20 84:12
**JetNet** 97:4 99:13
  102:17 103:8
**jets** 12:11 17:14
  54:16 84:13
**job** 9:10
**jobs** 15:25 16:1
**Jones** 1:5 5:9 37:10
  56:10,14 58:16,20
  66:1 68:20 93:9
  94:12,22
**journal** 27:20,21
  28:2,16,19 29:5,9
  29:16
**journals** 27:12 28:8
**judge** 1:6 35:7
**June** 10:17,19 40:14
  41:5

_____
**K**
**Kathy** 2:6 4:19 79:3
  107:3,22
**keep** 19:25 24:14
**Keith** 1:11 3:12,14
  5:1,22 10:5
  105:23 107:5
**Ken** 31:19
**kind** 15:25 42:8
  75:10
**kinds** 17:9
**KMLB** 61:18
**know** 7:9,10 8:25
  25:11 31:8,17
  35:17,18 37:21

81:1,5 85:11
  93:18,21,25 94:24
  99:24 104:17
**knowledge** 85:7
  88:13 107:15

_____
**L**
**L** 4:1
**labeled** 3:18,20,23
  67:6 69:24
**Lakefront** 61:8
**land** 54:22
**landed** 36:23
**landing** 36:18
**landings** 103:13
**large** 12:11
**larger** 14:5
**lastly** 8:6 64:14
**late** 60:4
**law** 4:7 24:14
**lawsuit** 38:21,22
**lawyer** 43:20,24
  44:2,4,8,21
**lay** 12:20
**laymen's** 10:22
**left** 33:19 36:23
  70:19 83:9
**legal** 69:16 70:7
**legitimate** 38:25
**LEGRAND** 1:19
**lessen** 74:18 75:3,16
  76:5,22
**let's** 6:14,18 10:14
  14:24 16:19 33:7
  35:11 51:5 79:14
  79:24 81:4 83:14
  88:15 89:5,15
  92:6 95:22 104:4
  104:6
**letter** 92:4
**liaison** 54:25
**license** 11:4 18:8,9
  18:17 55:13
**licenses** 19:20 26:10
  48:23 49:9,11
  50:1
**life** 33:17
**light** 42:9
**liked** 85:3
**limit** 14:3 37:24
  38:10
**limitations** 71:20
  72:2,13 73:1 74:3
  74:9
**Lines** 12:4
**list** 16:15 33:2 44:25
  45:9,16 53:21

**listed** 15:4 28:9 50:1
  53:19 54:6 83:3
  96:7,13 97:21
**listing** 16:4
**listings** 16:2
**litigant** 107:16,17
  107:18
**litigation** 48:1,11,12
**little** 15:9,11,13
  18:5 19:17 81:14
  81:16 94:19 96:17
**live** 14:20 19:9
  20:22
**LLC** 1:7,20
**local** 20:12
**locked** 94:24
**Lockwood** 17:5
  23:9
**log** 23:1 50:20 70:23
**logbook** 3:23 21:18
  67:16 69:1,4,8,23
  70:5,7 85:21 86:1
  86:7
**logbooks** 21:9,13
  69:18
**long** 23:21 84:17
**look** 15:7 18:12
  25:10 26:2 36:9
  49:15 57:5 67:22
  70:6 71:11 100:4
  101:24 104:5
**looked** 25:25 26:5
  70:9,17
**looks** 11:25 27:6
  43:7 63:4 92:3,4
**loss** 29:22 42:22
  43:2,3 44:10,12
  44:15
**lost** 82:10
**lot** 19:19,19
**loud** 7:15,22
**Louisiana** 1:2,17,22
  4:20 107:4,14
**low** 103:6
**lower** 70:19

_____
**M**
**M** 1:7,11 3:1,12 5:1
  107:5
**machinery** 30:8,10
  30:13,15,17 32:11
  32:12
**MAGISTRATE** 1:8
**main** 36:21
**maintained** 70:7
**maintenance** 3:22
  12:16 13:5 20:14

21:4,25 22:3 23:1
  24:14 33:16 54:22
  54:25 68:25 69:4
  69:8,17,23 70:4
  70:23,24 82:17
  85:16 86:15 87:21
  102:2,7
**major** 16:20,25
  24:3,5,8 61:2,5
  104:20
**making** 77:15,24
  107:12
**management** 10:16
  11:12,14,18,20,23
  54:18,20,23
**manufacture**
  100:11 101:2
**manufacturer**
  22:22 61:9
**March** 18:21,21
  19:9
**marine** 30:18,18
**marital** 46:23
**mark** 1:20 5:7
  10:13 26:23 27:10
  51:1 58:2 62:21
  64:17 71:3 87:13
**marked** 25:15 26:5
  49:10 70:17
**market** 58:25 59:12
  82:11,14,18 85:22
  85:25 86:23,25
  88:8,11,16,25
  89:3 92:11,18
  94:9,9,15,17
  95:23,24 100:20
  101:20
**match** 8:9
**matches** 101:14
**material** 62:3 86:3
**matrix** 52:12 89:7
  90:18 91:25
**matter** 38:23 56:14
  58:15 107:17,18
  107:19,20
**matters** 47:25 48:9
**mean** 8:25 21:10
  76:1
**meaning** 7:6
**means** 75:15
**measure** 82:10
**measured** 82:7
**measurements**
  63:21
**mechanic** 11:4
  12:14 13:12,17
  14:13 15:1,5 16:4

17:18 18:2,13
  19:3,5,13 20:18
  20:21 21:15 22:5
  23:19 54:13,15
  55:4
**mechanical** 17:21
**mechanics** 19:20
  21:21
**mediation** 40:23
  44:20
**MEERVELD** 1:8
**meet** 22:14
**MEI** 26:11
**mention** 63:6 83:19
  83:23 105:12
**mentioned** 50:5
**merely** 91:16
**met** 69:17
**metal** 22:19,20,21
  23:6
**method** 63:18 83:15
  107:8
**methods** 77:13
**MGI** 26:11
**Michael** 5:22
**MILES** 1:15
**million** 86:21 95:19
  100:10
**mine** 32:4
**minimal** 73:8
**minor** 67:24 81:7
  81:11 82:17
  104:21
**minus** 83:11 88:20
**minute** 77:21,22
**misjudged** 36:19
**missing** 35:21
**mitigate** 74:18 75:3
  75:14,15,18 76:21
  77:1,15,24 78:5
  79:5,22
**mitigates** 88:22
**mitigating** 77:11
  78:3
**mitigation** 79:18
**model** 98:10,15
  99:1,9,21 101:13
**models** 99:17
**moderate** 81:8,10
  82:23 83:11
  104:18,23,25
**modifications** 103:1
**modified** 105:9
**money** 103:24
**month** 95:20
**monthly** 28:2 29:16
**months** 19:1,2,6,14

20:17,19 21:14,15
21:20,21,23,24
22:6,18 23:4,15
53:18 99:14 101:3
101:19
**motion** 37:22,23
**MOULEDOUX**
1:19
**Mount** 12:15 13:14
13:23
**move** 18:8 83:9
**MTS** 27:20 28:16
81:2
**multi-discipline**
86:14
**Mustangs** 17:10

_____ **N** _____

**N** 3:1,1,1,7 4:1
**name** 5:7,21 9:13
35:19,20 36:3
38:16 39:1 40:9
43:19,23 46:9,14
**names** 34:17,21
39:5 47:8
**nature** 36:14 68:10
105:14
**near** 42:15
**nearly** 86:20
**neatly** 89:22 90:23
**necessary** 22:15
**necessity** 73:16
**need** 7:11,11,23,25
14:18 24:10 35:18
37:11 38:18 49:20
53:24 93:10
**needed** 8:21 55:1
**negative** 85:22,25
**negatively** 91:12
**never** 17:18 54:11
55:3 74:5,8,10
**new** 1:17,22 18:6,8
28:5 36:17 53:15
61:8 69:3 86:20
103:22
**nice** 7:21
**night** 42:7
**nine** 95:14,19 100:6
**nonaircraft** 76:15
**nonprofit** 14:17
**nonverbal** 7:18
**noon** 57:3
**note** 62:5 87:3
89:14,19
**noted** 62:7 63:11,19
64:8 65:2
**notes** 89:15 103:5

104:5
**notice** 56:22 57:14
57:20
**noticed** 39:18
**notion** 86:5
**November** 37:2
**NTSB-830** 81:22
**number** 31:11
48:21 49:22 50:11
52:11 62:21 64:17
67:4 69:25 71:18
72:22 83:8,19,23
**numeric** 88:10

_____ **O** _____

**O** 3:1 4:1
**oath** 4:21 107:5
**Object** 77:5
**Objection** 74:21
75:21 76:12
**objections** 4:12
**objectively** 97:25
**obligation** 74:17
75:2,11,18,25
76:4 79:5
**observation** 73:9
**observations** 91:20
**obsolescence** 82:6
**obtained** 10:15,18
**occupation** 9:8
**occurred** 58:7 76:6
79:22 89:16
**occurs** 75:19 76:7,8
**October** 18:4,14
40:22 41:5
**offer** 36:6 59:19
**offered** 96:9
**offering** 59:6
**office** 11:21,23
18:21
**officer** 107:4
**officiated** 4:21
**oftentimes** 11:5
**Oh** 41:13 44:5 49:2
**okay** 5:17 6:1,10,24
7:8,13,20 9:4,7,19
10:4,12 11:8,24
13:15 14:6,24
16:11,15 17:2
18:1,11,19 19:1
20:4 21:17,19
22:4 23:24 24:12
25:7 26:21 27:1,9
27:11,20 28:18
29:20 31:8,16,19
32:13,22 33:7,21
34:6,11,14 35:11

36:3,6,11 37:6,17
37:21 38:13 40:20
41:1,23 42:3,24
44:24 45:7 46:20
47:16,23 48:22
49:8,25 51:8
52:15 53:11,19
54:8 55:3 56:7,20
57:1 58:1,3,10
59:17 60:12 61:7
62:10,12 63:15,24
65:12,15,17 66:1
66:21,25 67:3,22
68:1,13,17,22
69:22 70:12 71:3
71:6,25 72:24
74:8,13 79:2,24
81:4 82:15,20
83:7,14 84:2,21
85:14 87:4 88:9
88:15 89:4,10,14
91:4,22 92:6
95:13,22 96:21
97:6,24 98:5
101:13,22 102:2
104:2,10,22 105:5
**old** 103:4
**older** 99:10,16,17
**on-campus** 11:11
**once** 55:9 75:19
91:9
**one-page** 10:9 27:7
**ones** 80:19 97:23
103:18
**operate** 14:9 77:12
**operated** 14:4
**operating** 71:19
72:2,13,25 74:3,9
**operation** 12:18,25
15:18,21 39:15
77:9 96:7
**operational** 79:21
**operations** 14:17
15:16
**operator** 12:17
24:13 79:4 103:23
**opinion** 34:4 35:8
37:25 40:2 43:1
46:16 58:24 59:18
60:15 61:6 83:2
86:2,9,10,12 87:9
88:8 90:4,6,8 91:1
91:13,14 93:2
103:10
**opinions** 5:13 42:24
48:7 59:6,12
74:15 86:11 89:20

90:21 107:14
**opposed** 83:9 87:6
**opted** 66:1,3
**Option** 65:22,23
**options** 65:22
**order** 24:2,7 35:17
37:16 52:23 56:4
70:6
**organization** 15:19
**organizations** 16:14
19:21 105:9
**original** 107:2,3
**originate** 105:7
**Orlando** 61:24
**Orleans** 1:17,22
61:9
**outcome** 107:20
**overall** 30:13
**overhaul** 103:22,24
**Overview** 58:22
**owned** 14:15 96:2
**owner** 24:13 41:21
74:17 75:2,17
76:17,20 77:1
78:9

_____ **P** _____

**P** 4:1
**P-51** 17:10
**P.M** 1:12 106:11
**page** 3:3 26:22
58:11 60:13 62:11
67:8,23,23 68:1,2
69:7 71:11 80:1
81:4,12 83:14,20
85:15,15,21 86:1
88:15 89:5 92:17
95:22 97:10,21
98:5 100:16 107:3
**pages** 26:22 67:7,18
68:23 91:24 92:3
92:4 107:7
**paginated** 67:17,19
**PAI** 64:1
**paid** 20:11 94:13,22
103:20
**paperwork** 54:21
**paragraph** 58:23
65:21 71:11,14
73:5 82:5 90:17
95:7
**parcel** 46:25
**paren** 71:21,22
92:19,19
**parentheses** 61:22
70:18,19
**park** 77:17 78:9

**parking** 39:21
**Parkway** 1:11 5:25
**part** 4:16 6:22 11:3
12:16,21,23 13:18
13:24,24 14:1
23:5 25:24 29:21
42:13 46:25 60:12
60:14 69:13 92:6
93:21 95:4 103:7
**participation** 53:13
**particular** 55:2
72:24
**parties** 4:3 47:9
107:19
**partnership** 41:24
**parts** 36:22 84:8
105:13
**party** 39:2 107:16
107:17,18
**pass** 51:20 57:24
**passengers** 101:25
**path** 11:15
**pause** 8:17 58:7
89:16
**pay** 16:13
**PC-12** 35:12 36:15
36:24
**peer** 28:9 29:24
80:15,23,25
**peer-reviewed** 86:4
**people** 8:15 12:20
31:11,14 54:25
**People's** 12:7
**percent** 29:2 48:3,5
48:12
**percentage** 47:23
48:13,14
**perception** 82:11,14
85:23,25 88:7,11
**perfectly** 70:9
**performed** 21:9
61:23 63:18 64:23
70:24
**performing** 12:15
**period** 20:18 22:13
48:20 98:25 99:2
99:3,4,6
**periodic** 51:25
**periodically** 55:7
**permanent** 68:7,14
70:18,25 72:5,8
72:23
**permit** 72:17,18
**person** 107:12
**personal** 107:8
**petitioned** 19:22
**Phenom** 17:22

23:12 86:21 89:1
95:23 96:6 98:7
99:14,18 100:23
100:25 101:14,16
**Phoenix** 6:23 33:11
34:25 47:19,20
**Pilatus** 35:12 36:15
40:4
**pilot** 11:25 12:2
16:7 36:19 55:13
58:16
**pilots** 39:17
**PIPES** 1:15
**Piston** 13:10
**pitched** 17:12
**plaintiff** 1:18 35:14
35:20 36:12,13
37:3 38:16,22
39:5,10,12 40:16
41:10,20,21 43:20
44:8 45:20 46:8
46:12 48:13
**plaintiff's** 36:3 44:4
**plaintiffs** 47:9
**plan** 93:19
**plane** 23:2,7 61:7
75:4,18,19 94:1,5
94:11 95:13
**Plant** 11:4 18:3
**please** 5:20 7:5 8:19
9:1 15:13 20:5
53:25 64:18 74:24
106:7
**plugged** 39:15,17
**point** 7:25 9:23 51:2
83:24
**possession** 57:12,18
**possible** 62:3 65:1
88:1
**post** 40:3
**post-repair** 59:1
60:15 71:15
**potential** 88:1
**power** 11:4 18:3
39:15,19 46:11
61:23 65:6
**Poydras** 1:16,21
**practice** 37:22
**preaccident** 94:4
**predamage** 91:13
92:9,10
**Predamaged**
100:20
**Preece** 2:2 60:6
**preferable** 102:8
**prepaid** 103:23
**prepare** 59:21

**prepared** 36:6
107:8,10
**present** 2:1 16:9
20:12 50:20
**pressure** 39:22
**Pretty** 52:24
**prevent** 38:9
**previous** 9:10 91:24
**previously** 25:15
26:4
**price** 93:24 94:25
98:8 99:7,23
100:10
**primarily** 29:20
**principally** 11:21
28:24 90:4
**printout** 103:8
**prior** 22:13 31:4
32:17,18 46:17
56:9,13
**private** 13:2 84:13
**probably** 23:22
66:16 72:17
**Procedure** 4:6
107:14
**procedures** 77:14
**proceedings** 3:15
58:8 89:17
**proceeds** 68:9
**process** 23:5 90:20
91:18
**produce** 93:20
**produced** 42:22
57:12,15,18 69:14
93:19 95:4
**production** 25:24
52:16 57:4,13,19
**Professional** 2:7
15:24 16:3,16
50:5 107:23
**professionals** 29:14
**program** 11:3,9
102:3,4,7
**programs** 103:18
103:21
**prohibited** 107:15
**prohibition** 107:13
**prone** 84:10
**propeller** 13:9
**propeller-driven**
13:6,7
**proper** 70:7 77:13
**property** 76:19
**protect** 76:18
**protective** 37:16
**provide** 7:2 37:9
68:9

**provided** 43:7 86:18
**provides** 52:20
74:15
**PT-19** 17:10
**public** 38:23
**publication** 28:24
80:14 86:4
**publications** 3:13
25:8 27:2,11,18
**publish** 28:10
**published** 27:21
28:14,17,18
**publishes** 104:19
**purchased** 95:13
**pure** 29:11
**purpose** 90:17
**purposely** 19:17
**purposes** 4:6 70:22
71:2 82:22 103:25
**pursue** 11:16
**put** 6:7 21:8 42:8
50:16 73:21,22,23
80:20 84:18 90:15
90:17 91:24 95:7
103:24
**Puts** 9:25 25:21
27:4 49:4 54:2
56:24 58:12 62:15
65:19 66:23 69:10
71:9 80:3
**putting** 16:25 39:23

**Q**

**qualifications** 10:6
22:14
**quality** 83:15,17
**question** 4:13 7:5,6
7:10,12 8:4,5,10
8:11,12,12,22 9:2
9:3 25:8 29:7 33:2
38:5 51:17 73:21
**question-and-ans...**
8:8
**questions** 7:15
24:25 51:14 79:18
85:1 104:8 105:17
105:22
**Quinn** 84:16,17,22
**quite** 36:25 100:1
**quote** 71:21,21

**R**

**R.S** 107:6
**rainwater** 78:11
**ramp** 36:16 39:18
42:6
**ran** 33:19

**range** 99:25
**rating** 18:7 22:6
55:17,20,22,24
56:2,4
**ratings** 55:6,12
**Re-notice** 3:17 57:2
**read** 10:6 15:16
27:14 30:10 33:9
35:12 38:15 40:15
50:7 53:20 54:5
58:22 60:17,23
61:25 62:4,8
63:12,22 64:9
65:3 68:4,7 70:20
71:16,23 73:8
80:7 82:12 83:4
83:17 85:17,23
88:17 89:7,23
90:24 92:20 93:5
95:23 96:8 98:1
99:15
**reader** 90:18,25
91:17
**reading** 4:8
**real** 93:4
**really** 8:14 13:12
46:18 75:10 84:21
93:13
**reasons** 81:24
**recall** 40:9 66:15
**receive** 88:11
**received** 18:9 27:25
53:3 60:2
**receptacle** 39:20
**recess** 51:9 104:13
**recognition** 50:8
**recognize** 25:13
**recollection** 44:14
46:10
**record** 5:21 6:14,16
6:18 20:20 38:23
51:11 66:9 67:13
78:17,19 79:10,12
79:15 105:25
106:2
**recorded** 63:21
85:16
**records** 19:12 20:13
24:14 39:8 42:20
43:22 44:1,14
46:6 81:5 85:17
93:11
**recurring** 71:19
72:1,12,25 73:16
74:2,6
**reference** 65:13
**referred** 11:5

**referring** 25:17
62:19 63:2 96:3
**reflect** 44:25
**reflected** 23:1 45:8
49:9
**reflects** 68:19
**regard** 79:18
**registered** 2:7 24:13
107:23
**regulated** 77:10
**regulation** 78:8
**reinstated** 26:12
**related** 3:15 81:24
82:11 107:19
**relationship** 107:16
107:17,18
**relationships**
107:13
**relative** 5:12,14
35:13
**relatively** 69:3
**relented** 19:24
**relevant** 62:6 63:10
63:19 64:7,10
65:1 101:6
**reliance** 95:4
**remember** 31:13
34:17,21 39:4
43:19,21,23,25
46:8,13 47:8 63:3
66:12 102:12
**Remote** 1:11
**renew** 53:5 55:19
55:21
**renewal** 19:8 22:13
22:14 51:25 53:10
**renewed** 18:24
20:15 52:3,6 55:7
55:14
**renews** 53:7
**repair** 17:1 22:23
23:16 24:6,8,10
40:3 65:22 66:2,4
66:9,9 67:12,24
68:7,14,14 70:18
70:25 71:22 72:1
72:8,11,17,18,19
72:20,23,24 73:5
73:15,19,19 74:2
74:5,7,9,10,12
76:2 78:6 81:7
82:17,19 83:16,16
85:16,20,24 86:7
86:21,25 87:2
104:18,21,23
105:1
**repaired** 24:9

**repairs** 12:16 13:5 16:20 23:17,18 24:3 68:10 72:5 72:14 74:11 87:1 105:13
**rephrase** 29:7
**replace** 65:23
**replacement** 66:4
**report** 3:24 5:13,19 26:14 34:1 42:1 50:23 53:1 58:4 58:11 59:9,15,24 60:3,7,13,15 62:6 62:11 63:6 64:6 65:16,17 71:5,7 79:25,25 81:22 83:20 84:23 85:4 90:19 91:18 92:3 92:7 94:18 96:14 97:10 100:19 104:25 105:3
**reported** 2:5 107:7
**reporter** 2:7,7 4:20 5:3 8:14 77:20 78:13 79:7 106:3 106:8 107:4,22,23
**REPORTER'S** 107:1
**reporting** 107:7,16
**reports** 42:23 43:5 43:11 52:16 60:1 62:18
**represent** 5:7
**representative** 64:1
**request** 57:13,19
**require** 19:16 72:6
**required** 21:8,12 24:14 50:12,20,22 52:22 56:3 72:12 74:2,6 107:3,10
**requirements** 50:11 69:17
**requires** 50:16 53:13 55:24 69:16 72:21
**reserved** 4:15
**respond** 8:21
**response** 7:19 8:11 53:23 60:21 73:10 76:9
**responsibility** 78:7
**responsive** 57:13,19
**responsiveness** 4:14
**restate** 16:12 20:5 42:19 55:11 74:24 75:9
**restoration** 15:20

16:24
**restroom** 8:1
**result** 85:19,22,24
**resulted** 73:16 98:7
**resulting** 62:4
**results** 65:10 83:8
**resum** 15:1
**retained** 58:15
**retention** 58:19
**retire** 84:6
**retired** 9:10 19:19
**retrain** 56:3
**reveal** 38:24
**review** 28:13,14 50:23 53:1,14
**reviewed** 28:9 29:25 52:16 59:23 70:4 80:15,23
**reviewer** 52:18
**reviewing** 80:25
**revoked** 24:20 25:2
**rewrite** 28:1
**ribs** 70:19
**right** 10:6 11:21,22 12:5,19 13:20 16:4 18:4,12,22 21:6,16,19 22:8 36:7,10 37:4 39:4 40:22 41:13 43:2 43:10 44:5,22,24 47:24 52:17 53:22 55:19 56:1,5,6,7 57:9 58:20 59:2,3 59:7,15,19 60:10 60:20 61:3,15,24 62:1 63:11 65:7 67:24 69:18 71:16 71:23 72:15 73:2 73:9 79:20,24 80:18 81:18 84:23 85:6,7,12 88:12 88:17 89:1,12,13 89:23 90:15 92:8 92:12,13,15,16,20 92:21 94:9 95:16 97:11 98:1,24 99:4,8,18,19 100:10 101:1 102:4 105:6,15
**risk** 86:23 87:24
**road** 7:2 72:22 88:2
**Robert** 2:2
**roof** 76:16,18
**rotate** 89:5 100:5,17
**rotating** 42:9
**rotorhead** 36:21
**RPR** 2:6 107:22

**rules** 4:5 7:2 14:4 53:15 70:8 107:11 107:14
**running** 42:11

─────────
**S**
─────────

**S** 4:1
**safety** 81:24
**safety-related** 81:23
**sale** 96:7,10,13 101:20
**sales** 88:16,25 92:25 93:23 94:18 95:10 95:15 97:9,18 98:6,22 99:7,13 99:22 100:10
**save** 4:12
**savvy** 87:2
**saw** 52:15 66:17
**saying** 53:8 88:19
**says** 10:5,15 15:15 30:6 35:23 54:4 63:10,13,19 68:6 68:14 70:14 71:14 78:9 80:15
**scale** 83:10 88:6
**scheduled** 12:24 53:18
**Science** 10:16,18 11:15
**scope** 59:4,5,8
**scrap** 81:25
**screen** 9:25 25:21 27:4 49:4 54:2 56:24 58:12 62:15 65:19 66:23 69:10 71:9 80:3
**scroll** 15:9 26:15 96:15 98:12
**seal** 107:3
**sealing** 4:10
**seats** 14:2
**Sebring** 41:17 42:6 42:6
**second** 43:3
**secondary** 80:13
**section** 16:16 30:24 30:25 32:2 59:9 62:19 68:2 71:12 80:22 83:20 91:24
**sections** 68:18
**security** 42:7,10
**see** 10:2,4 12:9 25:17 27:7,15 48:25 49:2 54:4,6 66:13,25 67:5,6 70:20 80:7 87:24

89:5 93:10 95:10 101:8
**seeing** 66:12,15
**seen** 57:6 67:9,19 73:15 74:1,5,8,10 74:11
**selected** 97:15
**selling** 94:21
**sense** 49:13 76:1 77:17 78:4,8 79:21 95:25
**sent** 6:7
**sentence** 82:13
**separate** 43:1 44:11 45:3 59:8 73:23 88:4
**separated** 13:25
**series** 61:14,19 62:13
**seriously** 39:21
**serve-and-volley** 8:9
**served** 22:5 44:20
**service** 84:6
**services** 107:13
**session** 8:8
**set** 57:2,14 107:6
**settled** 38:19 39:7
**settlement** 38:25
**seven** 100:6
**severe** 76:16
**shaking** 7:18
**share** 9:22 25:19 48:24 65:17
**shared** 5:14
**sharing** 23:24 56:20 62:10 65:15 68:24 71:4 74:14 104:12
**Shaw** 2:6 4:19 107:3,22
**sheet** 21:11 22:19 22:20,21 23:6
**shift** 55:2
**shop** 20:24 33:16,17
**show** 21:13,18 53:24 56:21 58:10 62:12 63:15 64:4 66:10,16,18 69:7 71:6 91:16 95:5 99:19
**showed** 25:15 99:22
**showing** 21:14
**shown** 94:17
**shows** 18:13 91:7 94:19 99:13
**sic** 42:5
**side** 8:16 35:2 44:21

48:13,14 60:2
**sides** 46:15
**sign** 24:2,7
**signature** 1:7,8 5:7 16:25 69:25 107:2
**signed** 63:25 94:14
**significant** 15:4
**significantly** 94:10 101:11 103:10
**signing** 4:9
**similar** 20:7 26:7 52:24 102:7
**simply** 86:6 89:21 90:22
**single** 36:15 45:9
**sir** 9:6 96:4
**sitting** 20:23 36:16 42:5
**six** 19:2,6,14 20:18 21:14,21,24 22:6 90:3,10 99:14 100:6 101:3,19
**skills** 14:18
**slightest** 73:7
**slightly** 25:12
**slower** 79:3
**small** 17:6 28:3 42:7 42:8
**smaller** 14:1 33:17
**Smith** 65:5
**Society** 27:13 30:3 31:5 50:6,9 51:14 52:6,21
**sold** 94:12 101:3
**somebody** 8:1 69:25 74:13,15 101:7
**sophisticated** 86:23
**sorry** 44:5,8 47:16 49:2 70:15 73:14 75:8 87:16 100:17
**sort** 9:19 28:13
**sought** 4:17
**sounds** 54:20 104:10
**source** 27:14 30:3 32:8,10 80:9,14 82:3 86:3,9 96:12
**sources** 96:23,25 97:7 102:13 105:8
**Southern** 10:16,20 11:2 46:11
**spar** 86:22 87:1
**speak** 7:21 8:24
**speaking** 8:15
**special** 71:19 72:1,6 72:21
**specific** 19:15 21:3

| | | | | |
|---|---|---|---|---|
| 30:12,12 86:18 87:5 | **suffers** 74:19 76:16 76:19 | **Technology** 10:19 | 27:21,22 31:4 45:13 83:8,12 | 75:18 76:4,22 77:1 79:2,3,21 |
| **specifically** 4:9,11 58:11 | **sufficient** 9:3 | **tell** 7:5 8:20 9:1 26:3 42:3 93:15 | 88:8 100:6 | 100:5 101:5 |
| **speculative** 83:25 85:9 | **suggest** 94:2 | **telling** 51:15 55:1 | **three-level** 86:5 | **Tuesday** 1:12 |
| **speed** 38:6 | **suggesting** 85:18 | **temporary** 68:13 | **tie-in** 20:10 | **turbine** 13:19 |
| **spent** 59:25 | **suggests** 12:13 87:5 98:6 | 71:25 72:7,11,14 | **time** 4:15 6:12,21 | **turbojet** 49:19 |
| **spreadsheet** 94:17 94:18 | **Suite** 1:17,21 5:25 | 72:18 73:15,19 74:1,5,7,8,12 | 7:24 8:15,21 9:3 11:9 14:17 17:23 | **turboprop** 13:10 14:10 36:16 |
| **staff** 9:20 | **summary** 15:8,8,24 26:6 60:20,22 | **ten** 23:22 46:15 96:4,6,12,20 | 18:6 20:2,8 21:3 21:11,11 23:19,25 | **turboprops** 14:7 |
| **stand** 89:25 | 71:14 89:7 | **ten-minute** 51:5 104:6 | 45:5 51:21 52:5 | **turn** 25:7 27:1 32:24 48:22 58:3 |
| **start** 8:10 33:7 | **supervised** 21:20,24 22:2 | **tender** 34:11 | 52:10 53:2 54:9 54:11 59:25 60:10 | 60:12 68:1 79:24 81:4 83:14 85:14 |
| **started** 12:1 33:18 33:19 105:11 | **supervision** 107:8 | **tendered** 5:9 | 62:7 63:11,20 64:8 65:2,10 66:3 | 88:15 89:4 92:17 95:22 98:5 100:16 |
| **starts** 60:13 | **supply** 35:22 36:1 39:9 | **tennis** 8:9 | 68:24 85:12 98:25 99:1,3,4,7 102:10 | **turning** 54:17 |
| **state** 4:20 5:20 33:12,13 35:25 | **support** 1:7 33:18 44:21 | **term** 20:6 104:23 | 103:6,25 104:12 105:18 | **twice** 42:17 44:3,9 |
| 46:3 47:20,21 107:4 | **supports** 86:4 | **terms** 10:22 | **times** 6:4,8,11 45:7 45:13 72:10 | **two** 8:15 10:24 11:1 18:24 27:24 35:3 |
| **stated** 62:6 71:18 | **sure** 7:21,24 9:2 28:15 35:17 37:8 | **test** 51:18,23 52:9 63:18 65:10 | **title** 32:7,10 | 39:7 41:4 42:22 43:11 44:11 53:14 |
| **STATES** 1:1 | 37:11 66:17,19 | **testified** 5:4 6:2,5 45:4,8,14,15 | **today** 7:3 23:13 56:15 57:2 59:6 | 57:21 60:1,12,14 65:21 66:5 100:5 |
| **stating** 81:9 | **Surface** 61:21 64:24 | 46:21 47:17 | 89:25 105:18 | 100:9 |
| **station** 24:10 76:2 | **surge** 39:24 | **testify** 45:18,21 47:12 59:17 107:6 | **today's** 59:22 | **two-year** 22:13 99:6 |
| **status** 103:16 | **suspended** 24:17 25:1 | **testifying** 6:11 38:10,11 | **told** 66:6 95:1 | **type** 19:23 23:7 49:15 55:6,12,17 |
| **statute** 107:11 | **sworn** 5:2 43:12 107:6 | **testimony** 3:15 6:21 32:25 33:2,8 34:6 | **tool** 93:9 | 55:19,21,24 56:2 56:4 82:19 83:3 |
| **stenotype** 107:7 | **system** 39:24 | 34:8 35:8 37:25 45:1,9,11,12,13 | **tools** 20:24 | 87:1 88:16 91:15 102:3 |
| **step** 8:25 | | 107:4,7 | **top** 10:4 33:8 42:9 50:24 | **types** 17:2 29:18 52:14 87:22 |
| **steps** 76:17,22 | **T** | **testing** 62:5 | **touch** 42:13 | **typeset** 25:12 26:2 |
| **stigma** 88:1 | **T** 3:1,7 4:1,1 | **tests** 62:2 | **touchdown** 36:19 | **typical** 11:14 70:6 |
| **stipulated** 4:2 | **table** 8:4 98:19 100:4,5 | **textbook** 27:14 30:4 32:8,10,18 80:14 | **trade** 27:12,21 28:8 28:19 29:5 | **typically** 72:19 102:6 |
| **stop** 23:24 56:20 62:10 65:15 68:24 | **tail** 42:14 | 80:21,24 | **training** 55:22,25 | **typographical** 28:15 |
| 71:4 74:14 104:12 | **tailbone** 36:20 | **texting** 8:2 | **transaction** 95:10 | |
| **stopping** 42:12 | **take** 7:23,24 8:3,5 8:18 40:6 51:2,4,5 | **Thank** 62:25 90:14 105:18,20 106:9 | **transactions** 101:18 | **U** |
| **stops** 8:22 | 51:18 52:9 55:15 | **thereof** 4:16 | **transcribed** 107:8 | **U** 4:1 |
| **Street** 1:16,21 | 76:21 104:4,6 | **thickness** 61:23 62:3 63:20 | **transcript** 107:2,9 107:10,10 | **uh-huh** 7:17 36:1 100:8 |
| **strictly** 29:11 | **taken** 4:5 51:9 104:13 105:8 | **thing** 8:3 26:1 | **transitioned** 12:3 | **ultimately** 66:10 68:19 97:20 |
| **Strike** 34:7 40:12 | 107:5 | **things** 38:6 77:15 77:24 83:19,23 | **transport** 55:13 | **Ultrasonic** 61:22 62:17 |
| **strongest** 97:22 | **takes** 67:9 76:17 | 105:14 | **treated** 69:18 | **Ultrasound** 64:5 |
| **struck** 36:20 | **talk** 10:14 16:12 56:7 79:3,3 98:20 | **think** 15:7 26:6 31:17 41:13 46:11 | **trend** 98:6 | **uncertainty** 87:25 |
| **student** 11:10 | **talked** 85:1 | 57:21 87:14 104:15 | **trends** 98:22 | **undamaged** 58:25 59:12 82:9 91:13 |
| **subject** 24:23 25:4 28:13 29:18 33:20 | **talking** 8:10 16:13 23:12 66:20 71:13 | **thinking** 8:20 | **Trent** 58:15 | 92:11 |
| 36:24 37:22 38:8 | 98:25 99:3 | **third** 46:20 | **trial** 6:2,5 33:8 34:6 34:8 36:2 37:19 | **undergone** 16:24 |
| 39:3 50:2 51:24 58:24,25 59:14 | **tank** 23:16,19 86:22 | **third-party** 52:17 | 45:1,4,8,11,12,13 45:15 46:21 59:18 | **understand** 5:8,11 5:15 7:4 74:23 |
| 60:23 61:18 71:15 72:11 94:20 | **tanks** 83:21 84:11 84:13 | **thought** 8:13 90:20 91:7,18 101:7 | **tried** 38:9 | 75:10,15 87:5 |
| 100:14 101:12,16 | **tarp** 76:17 | **thoughts** 8:17 | **true** 84:2 107:9 | |
| **subjective** 90:4,7 | **Technical** 30:10 32:12 | **three** 11:12 20:25 | **truly** 7:9 | |
| **subjectivity** 82:24 | **technically** 21:20 | | **truthful** 69:19 | |
| **submission** 53:1 | | | **try** 7:15 8:6,9 37:24 38:6 74:17 75:2 | |
| **submit** 28:10,12 50:22 | | | | |
| **suffer** 75:3 77:2 | | | | |
| **Suffered** 88:17 | | | | |

90:19 91:1,17 101:8
**understanding** 18:1 107:9
**understood** 9:5 100:13
**undervalue** 94:8
**underwent** 61:14,19
**undocumented** 21:2
**unh-unh** 7:17 91:12
**unique** 89:21 90:23
**unit** 39:15
**UNITED** 1:1
**University** 11:2
**updated** 53:13
**upgrades** 103:2,5
**usable** 56:5
**use** 7:16 8:1 42:22 43:2,4 44:10,12 44:15 80:16 92:23 92:24 93:16 95:9 97:18 102:19,22 102:24
**uses** 81:23 104:19
**USPAP** 53:12,14,15 53:16
**utilized** 97:1

_____
**V**

**v** 47:17
**vague** 19:17
**valid** 24:2,7 107:2
**valuation** 29:21 30:14 34:2,12,15 50:17,19 87:19 92:11
**value** 27:23 28:6 29:19 30:5,25 32:3 35:8 40:3,15 43:2 46:16,24 47:15 48:7 58:25 59:1,13,13 60:16 80:5,22 81:19 82:2,3,8,10 85:19 86:6,16 88:21 89:7,20 90:6,20 90:21 91:13 92:8 92:11,15,18 94:4 94:17 95:15 100:21 101:11 103:11,25
**valued** 103:21
**valuing** 30:8,17 32:11
**VAN** 1:8
**variables** 89:22 90:23

**various** 57:4 96:23
**vehicle** 42:8
**verbiage** 26:7
**versus** 1:6 33:9 40:19
**vessel** 39:22,23
**view** 20:6 82:19
**vintage** 15:15,18,21
**virtually** 84:3
**visible** 73:7
**Vision** 40:24 43:14
**vitae** 25:9
**volunteer** 16:14,18
**volunteers** 19:19
**VREF** 102:24

_____
**W**

**Wait** 77:21
**waived** 4:9,11
**want** 7:5,7 36:8 48:22 55:10,18 56:1 66:19 89:4
**wanted** 19:20 26:2 84:25 90:25 93:16
**War** 15:22
**wasn't** 29:7
**watchman** 42:7
**way** 35:22 38:10 67:8 77:12 83:10 85:3
**ways** 36:25
**we'll** 5:18 7:24 26:23 104:7
**we're** 5:11 10:12 16:13 23:12 27:9 32:22 33:1,5,6 56:14 58:1 65:12 66:19 71:3 104:8
**we've** 38:13 71:13 89:12
**website** 18:12
**week** 60:4
**weeks** 39:7
**weight** 14:2 71:15 90:10,15,16 91:10 91:14
**weighted** 28:25 29:2 29:10 89:6 90:11 91:2
**weighting** 91:4
**went** 39:16 51:16 80:23 95:19
**whatsoever** 50:2
**wing** 33:19 36:23 65:23 66:2,4,4 67:13 68:11 70:18 70:19

**wings** 84:11
**witness** 4:4,22 8:22 8:23 49:5 74:22 75:7,24 77:8 78:2 78:20 79:1 87:17 105:19
**word** 7:11
**worded** 85:3
**words** 54:23 83:1 91:23
**work** 11:22,23 13:13,18 14:17,25 15:5 16:14,18 17:14,18 19:10,13 19:16,20,23 20:18 20:21 21:4,7,9,14 21:15 22:19 23:2 23:6 47:24 54:18 54:20 56:8,9 59:9 60:1 63:18 68:19 84:19 86:13 97:8 98:18
**worked** 12:4,14 13:22 14:16 16:23 17:3,9,12 19:2 32:14 41:12,13,18 56:10,17
**working** 9:11 14:13 16:7 17:24 21:1 22:6 33:21,22 36:11 37:2 39:10 40:16 44:6 46:13 54:12,16
**worksheet** 91:14
**world** 15:21 76:24
**worse** 77:15,24 79:23
**worth** 95:20
**wouldn't** 72:7
**wrenches** 54:17
**write** 28:10,12 29:4 32:5
**written** 20:20 40:13 43:8,10 51:18 60:1 80:20
**wrote** 31:1 32:2 80:21

_____
**X**

**X** 3:1,1,7,7

_____
**Y**

**y'all** 78:21
**yeah** 12:6 29:6 51:4 65:11 66:18 72:16 75:17 78:16 79:14 95:18 96:5 98:23

99:19
**year** 6:22 19:7 26:13 47:6 48:2 48:15 53:17 99:1 99:9 100:1,2,3,11 101:2
**years** 6:6,12 11:2,12 16:19,22 17:3,15 18:25 19:18 23:23 33:4 45:1,4 46:15 49:17,22 50:14,21 52:4 53:6,15 66:5 80:20 86:12,13 94:14,23,25 98:10 98:15 103:4 105:10
**yellow** 42:9
**yesterday** 57:22

_____
**Z**

**zero** 103:21,25
**zoom** 40:25 57:3 90:12

_____
**0**

**049519** 2:8

_____
**1**

**1** 3:8 10:13 25:15 26:5 67:17,23 83:3 87:7 89:11
**1,825,000** 92:15
**10** 3:8 71:18
**10,7** 99:25
**10,800,000** 93:24 94:2,12 95:8,14
**106** 107:7
**11** 73:5
**11,840,000** 98:8 99:8,23
**1100** 1:16
**12** 18:14 57:3 70:19 92:19 95:22
**12:07** 1:12
**121** 13:18,24 14:3
**13** 70:20 97:10
**135** 13:18,24 14:1
**14** 30:5,21 86:20 98:5 100:10
**14,1** 99:25
**14,600,000** 92:12 95:16
**1434** 107:14
**15** 86:20 100:4,5
**15-hour** 53:16
**1551** 70:15
**16** 97:21 100:16

**18** 60:14
**19** 14:2 62:11
**1977** 12:15
**1978** 12:15
**1979** 13:16
**1980** 10:17,19 11:25 12:2 13:16 14:13 15:2,6 16:4 18:24
**1985** 12:4,10
**1987** 18:10 56:8
**1992** 16:9 56:9

_____
**2**

**2** 3:10 26:24 49:10 88:5
**2:59** 106:11
**20** 48:4 71:12 98:16
**200** 20:23
**2000s** 47:7
**2010** 45:17
**2011** 45:17
**2015** 27:25
**2018** 28:4
**2021** 18:4,14 28:19
**2022** 12:1,4,10 41:5 52:8 53:7 101:1
**2023** 38:14 40:14,23 41:5
**2024** 37:2 60:16 98:14,20,23 99:10 100:12
**2024-2025** 99:4
**2025** 6:23 18:21 19:8 26:20 33:8 47:18 58:17 61:20 63:7,8,17 64:7,12 64:15,23 98:20,23 100:3
**2026** 1:12 3:11 19:8 26:25 49:10 53:20
**2027** 53:5,7
**207** 69:24
**23rd** 61:20 63:7,8 63:16 64:12
**24** 19:1 20:17 21:15 21:20,23 22:18 23:4,15 68:2,3
**242** 3:19 63:16 65:14
**24th** 1:12
**25-1645** 1:5
**26** 3:10 26:19
**27** 3:12
**28** 67:7,18,23 68:23
**28-page** 3:20 66:8 68:18 70:16
**28th** 67:8

**29** 80:1 81:12

---
**3**

**3** 3:12 27:10 32:23 87:6,8 88:5
**30** 81:4
**300** 89:1 98:21 101:14
**300E** 17:22 23:12 86:21 95:23 96:6 98:7 99:14,18 101:14
**300Es** 100:25 101:16
**300s** 100:24
**30339** 1:11 5:25
**31** 83:14,20
**31st** 19:9 60:16
**33** 3:14
**3300** 1:17
**334** 96:8
**34** 85:15,15 86:12
**34.42** 92:19
**35** 88:15
**36** 89:5
**37:2554** 107:6
**3rd** 31:9,12,21,24 32:20 64:6,15,23

---
**4**

**4** 3:14 33:6 58:11 95:19
**4355** 1:11 5:24
**4th** 31:2 32:1,14

---
**5**

**5** 3:5,16 26:19 58:2 61:17 85:15 87:7
**50** 86:13
**53** 58:11 71:12
**53-page** 62:11
**57** 70:17
**58** 3:16 26:22 92:4
**5th** 3:10 26:25 49:10 53:19

---
**6**

**6** 3:18 65:13,21 89:11
**6/14/25** 3:24
**60** 3:19 65:14
**600** 1:21
**61** 92:3
**65** 3:18
**674** 67:6
**68** 3:20
**697** 68:3

---
**7**

**7** 3:20 68:23 70:17
**701** 1:21 3:21 67:9
**70139** 1:22
**70163** 1:17
**71** 3:22
**742k** 102:11
**767** 55:18 56:1,5

---
**8**

**8** 3:22 71:4
**80** 48:2,12
**8th** 58:16

---
**9**

**9** 3:24 71:11,14 92:5 92:17
**90** 101:19
**91** 12:16,21,23
**92** 3:19,24 65:14