**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JONES COMPANY**                                          **CIVIL ACTION**

**VERSUS**                                                 **No. 25-1645**

**SIGNATURE FLIGHT SUPPORT, LLC, ET AL.**                  **SECTION I**

**ORDER & REASONS**

Before the Court are two motions: defendant Phillip Everett's ("Everett") motion[1] to dismiss pursuant to Rule 12(b)(6) and plaintiff the Jones Company's ("plaintiff") motion[2] for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.

Everett moves to dismiss count two of plaintiff's first amended complaint, which alleges gross negligence against Everett, for a failure to state a claim upon which relief can be granted.[3] Plaintiff opposes[4] Everett's motion to dismiss. Everett did not file a reply.

Plaintiff moves for summary judgment in its favor on three issues against all defendants: (1) that an exculpatory clause ("Term (4)") in a document (the "landing card") prepared by defendant Signature Flight Support, LLC ("Signature") and signed by plaintiff's employee is "null, void, and unenforceable" as a "contract of adhesion;" (2) that Term (4) is separately and additionally "null, void, and unenforceable" as

---

[1] R. Doc. No. 43.
[2] R. Doc. No. 46.
[3] R. Doc. No. 43.
[4] R. Doc. No. 50.

1

contrary to Louisiana Civil Code Article 2004 ("Article 2004"); and (3) that even if Term (4) is exculpatory for Signature, it is not applicable to Everett because "he is not an 'affiliate' of signature to whose benefit Term (4) inures."[5] Both Signature and Everett (collectively, "defendants") oppose[6] plaintiff's motion. Plaintiff filed a reply reasserting its arguments in support of summary judgment.[7]

For the reasons that follow, the Court denies Everett's motion to dismiss count two, and grants in part and denies in part plaintiff's motion for summary judgment—finding that the landing card is not a contract of adhesion, Term (4) is unenforceable and void to the extent Signature or Everett claim it shields them from liability for their gross negligence, and Term (4) is not applicable to Everett because he is not an affiliate of Signature as the term is used in the landing card.

## I.    BACKGROUND

This action stems from damage caused to plaintiff's "brand new" aircraft, a 2024 Embraer Phenom 300E (the "aircraft").[8] On December 30, 2024, plaintiff landed at the New Orleans Lakefront Airport where Signature functions as a "fixed based operator," offering "refueling, cleaning, de-icing, and storage" services.[9] After landing in New Orleans, plaintiff's pilot, William "Trent" Cady ("Cady"), signed a partially pre-completed landing card from Signature that confirmed the services plaintiff required and handed custody of the aircraft to Signature.[10] Although plaintiff had

---

[5] *See generally* R. Doc. No. 46-1.
[6] R. Doc. Nos. 51, 52.
[7] R. Doc. No. 54.
[8] R. Doc. No. 46-1, at 5.
[9] R. Doc. No. 51-1, at 1.
[10] R. Doc. Nos. 46-6, 51-4; *see also infra* Attachment A (the landing card).

made a reservation with Signature ahead of time, plaintiff did not receive a copy of the landing card in advance of landing.[11]

According to plaintiff and Signature, after Signature took custody of the aircraft on December 30, 2024, Everett, then a Signature employee and assistant general manager, damaged the aircraft's wing.[12] The damage was caused when Everett "was towing the unpowered" aircraft and struck "a stationary, in-ground fire hydrant" and "continued to pull" the aircraft after striking the hydrant, "creas[ing]" the wing and resulting in visibly "leaking" fuel.[13] Plaintiff also alleges, and defendants dispute, that Everett failed to report the damage and attempted to "conceal[] it by placing a rock in the hole."[14] Plaintiff was not made aware of the damage,[15] and only discovered the damage two days later during Cady's pre-flight inspection for the return flight.[16]

Signature performed an investigation of the incident and ultimately terminated Everett's employment, on or around January 10, 2025.[17] Everett's notice of termination states:

> [O]n Monday, December 30, 2024, during your tow of [the aircraft], you damaged it and did not report it for two days. Your pre-tow inspection card reflects no damage to the aircraft before the tow. On Wednesday, January 1, 2025, you reported damage to its left wing.
>
> [Signature's] investigation concluded that your tow caused the wing to contact a fire hydrant and that you were untruthful during the

[11] R. Doc. No. 51-1, at 8.
[12] *Id.* at 9.
[13] R. Doc. No. 30 ¶¶ 9, 10.
[14] R. Doc. No. 51-1, at 9; R. Doc. No. 52-1, at 9.
[15] *Id.*
[16] R. Doc. No. 51-1, at 10.
[17] R. Doc. No. 30-2, at 9.

investigation. First, the aircraft did not move from when you towed it onto Taxiway A to the time you reported the damage.[18] You stated that you used the TT-8 tug when you used the white TLD tug. The tread marks from the TLD tug were present on Taxiway A consistent with contact of the fire hydrant on the side of Taxiway A and the damage on the left wing of the aircraft. We found pieces of the wing near the base of the fire hydrant, which was knocked over by approximately 5 degrees. Another inconsistency in your statement is that you stated your path of travel was on the centerline of Taxiway A although there was evidence that you swooped the aircraft off centerline and near the edge of the taxiway to position the aircraft for parking. This movement off the centerline is further confirmed by the tire marks left on the pavement. Additionally, you were observed making a sudden stop and then reversing the path of travel in the area where the fire hydrant is located. The damage to the aircraft is consistent with the movement that was observed . . . As a result of multiple avoidable SOP violations and untruthfulness, your employment is terminated.[19]

The aircraft's manufacturer represented to plaintiff that to permanently repair the wing, the entire wing would need to be replaced—a process with a "two-year lead time" and an estimated cost of $2,963,101.48.[20] To mitigate potential losses and make the aircraft ferriable, plaintiff temporarily repaired the damaged wing at an approximate cost of $250,000.[21] Plaintiff also alleges that it incurred other costs and expenses, such as "the costs to return the owners, guests, and pilots [of the aircraft] from New Orleans to Georgia, pilot supervision of repairs, [] charters for scheduled

---

[18] The Court acknowledges that it is unclear whether Everett or Cady first reported the damage to the aircraft on January 1, 2025. However, the difference is of no moment for the present order. In the absence of any evidence or allegations from defendants to the contrary, the Court will infer from plaintiff's factual allegations that regardless of whether Everett reported the damaged aircraft to Signature on January 1, 2025, plaintiff was not aware of the damage until Cady discovered it the same day.

[19] *Id.*

[20] R. Doc. No. 30, at ¶ 13.

[21] *Id.* at ¶ 14.

4

trips for which TJC could not use the Aircraft . . . [and diminution in value of the aircraft]."[22]

Plaintiff filed suit against Signature on August 11, 2025,[23] and on February 12, 2026, filed its first amended complaint[24] (the "complaint") against Signature and Everett. Count one of plaintiff's complaint alleges that Everett's negligent acts and omissions were the "proximate and legal cause" of plaintiff's damages.[25] Specifically, plaintiff states that Everett negligently: failed "to tow the [a]ircraft in a safe and prudent manner;" caused the aircraft's "wing to strike a stationary object;" failed "to maintain a proper lookout," did not "see what he should have seen," and did not "heed what [he] did see;" concealed "the damage to the [a]ircraft;" and failed to notify plaintiff of the damage.[26]

Count two alleges that Everett's acts and omissions were "not only" negligent, but grossly negligent, and the "proximate and legal cause" of plaintiff's damages.[27] Plaintiff also states that Everett's "reckless manner" in towing the aircraft and

---

[22] *Id.* at ¶¶ 15, 16.

[23] R. Doc. No. 1.

[24] R. Doc. No. 30. U.S. Magistrate Judge granted plaintiff's motion to file an out of time amended complaint to join Everett as a defendant. R. Doc. No. 18. The Magistrate Judge found that the out of time pleading was justified because Signature did not alert plaintiff to Everett's role in damaging the aircraft until after the pleading deadline, plaintiff promptly moved to amend its pleading, it is possible a trier of fact may find Everett independently liable outside of Signature's vicarious liability, trying Everett separately would prejudice plaintiff, and a continuance would cure any prejudice with respect to the parties' ability to meet the existing trial schedule. *Id.*

[25] R. Doc. No. 30, at ¶¶ 19–20.

[26] *Id.*

[27] *Id.* at ¶¶ 22, 23.

concealing the damage was grossly negligent, without "the slightest degree of care and diligence," and done "in spite of . . . the high risk of danger" to the "safety, welfare, and health of others, including [plaintiff]."[28]

Counts three and four allege that Signature is vicariously liable as Everett's employer for his aforementioned negligent and/or grossly negligent acts and omissions.[29] As relief, plaintiff requests monetary damages, including damages for "[a]ctual, temporary, permanent, and emergency repair costs;" loss of use, diminution in value, consequential damages, inconvenience, attorney's fees and costs; and "legal interest."[30]

In answer, Signature denies plaintiff's allegations to the extent they include "acts or omissions which might be considered gross negligence" or concern Everett's actions that are "outside the course and scope of [his] employment [with Signature] and/or actions or conduct motivated by personal considerations extraneous to Signature's interest."[31] During a telephone status conference on February 12, 2026, Signature conceded liability as to Everett's negligence, but did not concede any liability as to gross negligence.[32]

As of this date, Everett has not answered the complaint nor otherwise responded with respect to count one, alleging negligence on his part. However, on March 12, 2026, Everett moved to dismiss count two against him, arguing that

---

[28] *Id.*
[29] *Id.* at ¶¶ 25–27, 29–31.
[30] *Id.* at ¶ 33.
[31] R. Doc. No. 37, at ¶¶ 19–20, 22–23, 25–27, 29–31.
[32] R. Doc. No. 29.

plaintiff "fails to state a claim upon which relief can be granted because Louisiana law does not recognize gross negligence as an independent cause of action."[33] Plaintiff counters that its gross negligence claim is permitted pursuant to Article 2004[34] and that it has pleaded sufficient facts to establish a claim that "Everett acted in a reckless manner with complete indifference to the rights of others and that his grossly negligent actions" caused plaintiff's damages.[35]

Shortly after Everett filed his motion to dismiss, plaintiff filed a motion for summary judgment regarding the applicability of an exculpatory provision in the landing card ("Term (4)") to both defendants.[36] The core of the issue, according to plaintiff, is that while Signature has not disputed "that it is responsible for the direct, physical damage" to the aircraft,[37] it contests that pursuant to Term (4), it is not responsible for the "indirect, incidental, and consequential damages stemming from Everett's and its own tortious conduct."[38] Everett similarly claims Term (4) insulates him from such liability.[39] Term (4) of the landing card states in relevant part:

> The parties agree that under no circumstances shall Signature be liable to the Customer in relation to the Services for indirect, incidental, consequential, special or exemplary damages, whether in contract or tort (including strict liability and negligence), such as, but not limited to, loss of revenue, loss of use or anticipated profits, diminution or loss

---

[33] R. Doc. No. 43, at 1.

[34] "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party. Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party." La. Civ. Code art. 2004.

[35] R. Doc. No. 50, at 4, 7.

[36] R. Doc. No. 46.

[37] R. Doc. No. 51-1, at 10.

[38] R. Doc. No. 46-1, at 6.

[39] R. Doc. No. 52, at 8.

of value, travel room and meal accommodations, or costs associated with substitution or replacement aircraft.[40]

Plaintiff advances three areas of argument in its motion for summary judgment. First, plaintiff contends that Term (4) is a contract of adhesion and "null, void, and unenforceable" because plaintiff did not consent to the provision, the agreement lacked mutuality, and an unequal balance in bargaining power existed when the landing card was signed.[41] Second, plaintiff argues that Term (4) is "null, void, and unenforceable" because it attempts to prospectively limit Signature's liability for gross negligence in contravention of Article 2004.[42] Finally, plaintiff's position is that even if Term (4) is an enforceable clause as to Signature, the landing card defines Signature as "Signature Flight Support LLC and its affiliates," which does not include Everett.[43]

Defendants filed separate memoranda addressing each issue that plaintiff raises for summary judgment, advancing primarily the same arguments in opposition to plaintiff's motion. Defendants oppose plaintiff's first issue for summary judgment, arguing that the landing card is a valid and enforceable contract, not a contract of adhesion.[44] Similarly, defendants argue that Term (4) is enforceable as to ordinary negligence and that Article 2004 only nullifies the clause with respect to gross negligence.[45] Signature also asserts that Term (4) "does not purport to limit

---

[40] *See infra* Attachment A.
[41] R. Doc. No. 46-1, at 8, 11–12.
[42] *Id.* at 15–16.
[43] *Id.* at 16–18.
[44] R. Doc. No. 51, at 7–9; R. Doc. No. 52, at 3–5.
[45] *Id.* at 5–6, 8; R. Doc. No. 51, at 9–11.

Signature's liability for its own gross negligence" and "does not reference 'gross negligence' on its face."[46] Finally, defendants counter that Term (4) is applicable as to Everett because he falls under the definition of a Signature "affiliate" with respect to the terms of the landing card.[47] Everett also claims that even if the landing card is a contract of adhesion, it cannot "[s]trip a [n]on-[d]rafting [t]hird [p]arty of [i]ts [p]rotection."[48]

## II.    LAW & ANALYSIS

### a.    Choice of Law

This case is a diversity action,[49] filed pursuant to 28 U.S.C. § 1332(a). Therefore, as the parties agree, Louisiana substantive law and federal procedural rules apply. *Jack v. Evonik Corp.*, 79 F.4th 547, 555 (5th Cir. 2023).

When sitting in diversity, a federal court evaluates issues of state substantive law "by looking to the decisions of the state's highest court." *Keiland Constr., L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 418 (5th Cir. 2024) (citing *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018)). If lacking case law from the highest state court, here the Louisiana Supreme Court, a federal court "may look to decisions of the intermediate appellate courts, barring a reason to think the highest court would decide otherwise." *Id.* The federal court may consider the persuasiveness of intermediate appellate courts' decisions "only when" the highest court "has not

---

[46] *Id.* at 9, 10.
[47] *Id.* at 11; R. Doc. No. 52, at 8.
[48] *Id.* at 3.
[49] R. Doc. No. 1-1.

spoken on an issue." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 565 (5th Cir. 2004) (quotation and citation omitted).

### b.    Everett's Rule 12(b)(6) Motion to Dismiss Count Two

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must meet the requirement in Rule 8(a)(2), requiring "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). While this short and plain statement does not require "detailed factual allegations," it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotations and citations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Culbertson v. Lykos*, 790 F.3d 608, 616 (5th Cir. 2015) (citation and internal quotations omitted).

"[T]he face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the [plaintiff's] claim." *Hi-Tech Elec., Inc v. T&B Constr. & Elec. Servs., Inc.*, No. 15-3034, 2017 WL 615414, at *2 (E.D. La. Feb. 15, 2017) (Vance, J.) (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255–57 (5th Cir. 2009)). A complaint is insufficient if it

contains "only labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna,* 726 F.3d 631, 638 (5th Cir. 2013) (citation and internal quotations omitted). The complaint "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) (citation and internal quotations omitted).

In considering a motion to dismiss, a court views the complaint "in the light most favorable to [the] plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in [the] plaintiff's favor." *Lovick v. Ritemoney Ltd.,* 378 F.3d 433, 437 (5th Cir. 2004). A court must limit its review to "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).

Count two of the complaint alleges that Everett was grossly negligent in the "reckless manner" that he towed the aircraft and concealed the ensuing damage.[50] Plaintiff claims that Everett's "actions and omissions" were "in spite of . . . the high risk of danger" and "done with complete indifference to the rights, safety, welfare, and health of others . . . without even the slightest degree of care and diligence . . . in spite of the subjective and objective awareness of the high risk of danger involved."[51]

---

[50] R. Doc. No. 30, at ¶ 22.
[51] *Id*. at ¶¶ 22, 23.

Everett argues that the Court should dismiss count two pursuant to Rule 12(b)(6) because Louisiana substantive law has no independent cause of action for "gross negligence" and no statute creates a right for plaintiff's gross negligence claim.[52] Everett rests his hat on *Smith v. XTO Offshore, Inc.*, No. 11-01487, 2012 WL 1247224 (E.D. La. Apr. 12, 2012) (Lemelle, J). He argues that *Smith* found that "ordinary negligence" is the "exclusive tort remedy" in Louisiana.[53] Everett claims that per the principle of *expressio unius est exclusion alterius*,[54] because the Louisiana legislature only provides a gross negligence standard in a sparse minority of statutes,[55] any statutory cause of action that lacks an explicit reference to gross negligence was therefore intentional and does not provide a right to relief for damages from gross negligence.[56] He contends that plaintiff's deficiency is not in failing to plead sufficient facts, but in failing to assert a cause of action recognized pursuant to Louisiana law.[57]

---

[52] R. Doc. No. 43, at 2.

[53] R. Doc. No. 43-1, at 4.

[54] "[T]he settled doctrine of statutory construction, *expressio unius est exclusio alterius*, which dictates that 'when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have easily been included in the statute, is deemed intentional.'" *Wederstrandt v. Kol*, 366 So. 3d 47, 52 (La. 2023) (other quotation and citations omitted).

[55] "[G]ratuitous rescuers, La. R.S. 9:2793; public entities, La. R.S. 9:2793.1; Mardi Gras organizations, La. R.S. 9:2796; landowners as against trespassers, La. R.S. 9:2800.4 and La. R.S. 14:63(H); emergency medical technicians, La. R.S. 40:1235; and nonprofit corporate officers, La. R.S. 9:2792.1 . . . intoxicated drivers, La. Civ. Code Article 2315.4, and child pornography, La. Civ. Code Article 2315.3." R. Doc. No. 43-1, at 6.

[56] *Id.* at 4, 5, 7.

[57] *Id.* at 8.

Despite his aforementioned arguments, Everett does not contest that Article 2004 "prohibits contractual limitations on liability for 'intentional or gross fault'" and is one example where the Louisiana legislature enacted a statute "addressing gross negligence."[58] He fails to explain, or even acknowledge, Article 2004's obvious relevance to this dispute and how it undercuts the position he takes in his motion to dismiss.

Regardless, the Court finds Everett's arguments unpersuasive. First, unlike *Smith*, plaintiff has both pleaded facts alleging gross negligence[59] and an applicable statute, Article 2004, clearly articulates plaintiff's right to relief for damages from gross negligence. Further, Everett's suggested application of *Smith*, arguing that to seek relief for gross negligence the statutory cause of action must explicitly include a cause of action for gross negligence, is contradictory to how courts apply Article 2004's right to relief. *See Petrobras Am. Inc. v. Vicinay Cadenas, S.A.*, 780 F. App'x 96, 100 (5th Cir. 2019) (*per curiam*) ("Louisiana courts have never applied Article 2004 only to causes of action that include an element of intentional or gross fault.") (citations omitted); *Harvey Gulf Int'l Marine, LLC v. Hydradyne, LLC*, No. 24-592, 2024 WL 4512419 (E.D. La. Oct. 17, 2024) (Vitter, J) (analyzing, for purposes of a 12(b)(6) motion to dismiss, whether plaintiff pleaded sufficient facts to allege culpability beyond ordinary negligence to establish an exception to a limitation of liability clause, per Article 2004); *Sevarg Co. v. Energy Drilling Co.*, 591 So. 2d 1278, 1281 (La. App.

---

[58] *Id.* at 6.
[59] *See supra* notes 13, 14, 16, 28 and accompanying text.

3d Cir. 1991) (finding plaintiff's "allegation that the breach was the result of [defendant's] gross fault" was a "well-pleaded fact" supporting plaintiff's cause of action).[60]

Congruous to the defendant in *Petrobras*, Everett's position is essentially that the Court should dismiss count two because regardless of "whether the alleged underlying conduct involves" gross negligence, plaintiff does not have a statutory "***cause of action***." 780 F. App'x at 101 (emphasis in original). However, as the Fifth Circuit found, such an approach would "lead[] to strange results" and "make Article 2004 irrelevant except in cases of fraud and the rarest of other cases . . . because nearly all [of] Louisiana's causes of action do not require a plaintiff to prove any element that amounts to intentional or gross [negligence]." *Id.* at 100–101.

Everett's arguments concerning the application of *expressio unius est exclusion alterius* with respect to Louisiana tort law are similarly unavailing. The Fifth Circuit has previously ruled that the statutes that Everett cites[61] as providing the sole causes of action for gross negligence in Louisiana "are not causes of actions unto themselves," they "merely enhance damages" or limit immunity from liability. *Id.* at 101 & n.3. The parties do not contest that Louisiana Civil Code Article 2315 ("Article 2315") provides plaintiff's cause of action for the damage to the aircraft. Article 2315,

---

[60] Gross fault "includes not only gross negligence, but also bad faith breach of contract or fraud." *Wadick v. Gen. Heating & Air Conditioning, LLC*, 145 So. 3d 586, 598 (La. App. 4th Cir. 2014) (citing Article 2004, comment (a)).
[61] *See supra* note 55.

"Liability for acts causing damages,"[62] does not distinguish negligence from more deliberate forms of fault, such as willful or intentional harm. *Moses v. Butts*, 70 So. 2d 203, 206 (La. App. 1st Cir. 1954). As the Fifth Circuit has reasoned, Article 2315 provides a cause of action for damages due to negligence that necessarily includes a right to relief for gross negligence. *See Petrobras Am. Inc.*, 780 F. App'x at 101. Mere negligence is the threshold for finding a party liable for "fault" pursuant to an Article 2315 claim, *see Moses*, 70 So. 2d. at 206, and acts as "a floor, not a ceiling," *cf. Petrobras Am. Inc.*, 780 F. App'x at 102. Defendants do "not somehow escape liability" for gross negligence as their conduct "become[s] more egregious." *Cf. id.*

For these reasons, the Court denies Everett's motion to dismiss count two, plaintiff's gross negligence claim.

### c.    Plaintiff's Rule 56(a) Motion for Summary Judgment

Summary judgment is proper if, after reviewing the materials in the record, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the

---

[62] "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Article 2315.

absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the nonmovant fails to meet their burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See*

16

*Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### i.    *Whether the landing card is a contract of adhesion*

Pursuant to Louisiana law, "a contract of adhesion is a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection of the weaker party," which may "raise a question as to whether or not the weaker party actually consented to the terms." *Aguillard v. Auction Mgmt. Corp.*, 908 So.2d 1, 8–9 (La. 2005) (quotation and citation omitted). The party challenging the contract has the burden of proving its lack of consent. *Id.* at 10. The court focuses on the following factors: "(1) the physical characteristics of the [] clause, including font size; (2) the distinguished features of the [] clause; (3) the mutuality of the [] clause, in terms of the relative burdens and advantages conferred by the clause upon each party; and (4) the relative bargaining strength of the parties." *Georgetown Home Owners Ass'n*, 2021 WL 359735, at *12 (citing *Aguillard*, 908 So. 2d at 16–17).

Plaintiff claims the landing card, including Term (4), is a contract of adhesion and therefore unenforceable. First, plaintiff asserts that the physical placement of the binding terms and characteristics of the exculpatory provision are camouflaged, with misleading or missing section titles, small text, and the disclaimer of liability "buried" between other "benign terms."[63] Plaintiff also argues that there is a lack of

---

[63] R. Doc. No. 46-1, 10–11.

mutuality indicating unequal bargaining power because only plaintiff was required to sign the card and cede rights.[64] Further, according to plaintiff, the landing card was executed while plaintiff was in a "disadvantageous position."[65] In signing the landing card, plaintiff states that Cady "neither needed to read the fine print nor actually did read the fine print and thus was unaware" he was "subscribing" plaintiff to Term (4).[66] Cady believed he was merely completing a "necessary transaction" meant to note the aircraft's "operational needs."[67]

The Court agrees with plaintiff that the physical characteristics of the landing card lend themselves to a finding that the landing card was adhesionary—particularly considering the standard form of the agreement, the small typeface, and location of the waiver of liability following the bolded and underlined "definitions" header.[68] *Aguillard*, 908 So. 2d at 12 (holding that "[c]onsent is called into question by the standard form [and] small print" of an agreement); *cf. Georgetown Home Owners Ass'n*, 2021 WL 359735, at *13 (finding that the relevant portion "set off by a bold, capitalized header and the text of the [a]greement [being] equivalently sized to the rest of the document" suggested that the agreement was not adhesionary). Term (4) also does not appear mutually applicable as it only burdens plaintiff and waives its right to seek damages, without similarly binding Signature. *Cf. Aguillard*, 908 So.

---

[64] *Id.* at 11.

[65] *Id.* at 12.

[66] *Id.* Plaintiff has not argued that Cady lacked authority to sign the landing card on its behalf, but reserves the right to do so. *Id.* at 12 nn.10, 11; R. Doc. No. 54, at 3 n.1.

[67] *Id.* at 12.

[68] *See infra* Attachment A.

2d at 16 (finding mutuality where "the arbitration clause severely limits both the defendants' and the plaintiff's right to litigate").

However, the Court finds that plaintiff has failed to show that it was disadvantaged or possessed unequal bargaining power. Although plaintiff did not receive the landing card prior to landing in New Orleans, Cady stated that he was familiar with the landing card and had signed similar Signature agreements "at many" other airports.[69] Further, Signature also stated that it would have serviced the aircraft "in the same manner" regardless of whether the landing card was signed, as it has done when other customers refuse to sign the landing card.[70] Plaintiff was "not forced to agree to the terms" of the exculpatory clause. *See Georgetown Home Owners Ass'n*, 2021 WL 359735 at *13; *see also Aguillard*, 908 So. 2d at 17 ("[T]he underlying transaction . . . does not indicate that it was such a necessary transaction to establish the plaintiff was compelled to enter it.").

Notably, although Cady now states he has never read the terms of the landing card,[71] his signature on the agreement indicates otherwise.[72] "[A] party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him." *Geovera Specialty Ins. Co. v. Odoms*, No. 19-30971,

---

[69] R. Doc. No. 46-5, at 31:20–32:5.
[70] R. Doc. No. 46-4, at 159:9–21.
[71] R. Doc. No. 46-5, at 36:15–17.
[72] *See infra* Attachment A. Cady signed the landing card, which provides "I have read and understand, and have authority to accept on behalf of the owner or manager of the aircraft, this agreement." *Id*.

19

2020 WL 6532087, at *4 (5th Cir. Nov. 5, 2020) (quoting *Aguillard*, 908 So. 2d at 17). At a bare minimum, and contrary to plaintiff's position, Cady's attestations indicate that there is a genuine dispute as to whether he consented to the terms of the landing card. Accordingly, the Court finds that the plaintiff has failed to meet its burden of establishing there exists no genuine dispute of material fact with respect to whether it consented to the terms of the landing card. *Aguillard*, 908 So. 2d at 11.

### ii.    *Whether Term (4) is enforceable pursuant to Louisiana law*

Louisiana Civil Code Article 2004 directs, "[a]ny clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party." Gross fault encompasses gross negligence for purposes of Article 2004.[73] *Occidental Chem. Corp. v. Elliott Turbomachinery Co.*, 84 F.3d 172 (5th Cir. 1996).

The parties do not contest that Term (4) of the landing card may not prospectively limit a party's liability for gross negligence.[74] However, the parties disagree on two key issues: (1) whether Term (4) is drafted in a way where it offends Article 2004, and (2) if Term (4) offends Article 2004, whether Term (4) is null and unenforceable in its entirety or solely to the extent a party seeks to apply it to gross negligence.

---

[73] The discussion herein is limited to Article 2004's application to gross negligence because that is the issue presently before the Court. However, Article 2004 also applies to contractual clauses prospectively disclaiming liability for other forms of gross fault and liability for causing physical injury.
[74] R. Doc. No. 46-1, at 13; R. Doc. No. 51, at 9; R. Doc. No. 52, at 5.

20

Plaintiff argues that Term (4) impermissibly acts to prospectively limit Signature's liability for gross negligence related to consequential and incidental damages because it states, "under no circumstances shall Signature be liable to the Customer . . . for indirect, incidental, consequential, special or exemplary damages, whether in contract or tort (including strict liability and negligence)," without an exception for gross negligence.[75] While Everett does not challenge plaintiff's position on this issue, Signature counters that "Term (4) simply does not purport to limit Signature's liability for its own gross negligence."[76]

With respect to the first issue, the Court disagrees with Signature's reading of Term (4). The clause is not ambiguous or "susceptible of different meanings."[77] The plain language of the exculpatory clause attempts to limit liability for gross negligence, disclaiming "*under no circumstances* shall Signature be liable . . . for indirect . . . damages."[78] *See Ostrowiecki v. Aggressor Fleet, Ltd.*, No. 07-6598, 2008 WL 3874609, *12–13 (E.D. La. Aug. 15, 2008) (Africk, J) (finding language disclaiming liability "from any claim or lawsuit" offensive to Article 2004). Courts have consistently found language similar to that in Term (4) to run afoul of Article 2004. *See, e.g.*, *Occidental Chem. Corp.*, 84 F.3d at 173 n.4 ("[I]n no event shall Seller or its suppliers be liable, whether arising under contract, tort (including negligence), strict liability, or otherwise, for . . . any special, incidental, indirect or consequential

---

[75] R. Doc. No. 46-1, at 13–14; R. Doc. No. 46-6.

[76] R. Doc. No. 51, at 9.

[77] *Id*. at 10 (citing La. Civ. Code art. 2049).

[78] *See infra* Attachment A.

21

loss or damage."); *Petrobras Am. Inc.*, 780 F. App'x at 97–98 ("[W]hether due to the neglect or fault . . . each party hereby releases each other party (and such other party's group) from any liability for consequential loss of the releasing party.").

As the plain language of Term (4) offends Article 2004, the Court must next consider whether Term (4) is unenforceable in its entirety or solely as to its application to liability for gross negligence. *Wadick v. Gen. Heating & Air Conditioning, LLC*, 145 So. 3d 586, 596–97 (La. App. 4th Cir. 2014) (citing *Ostrowiecki*, 2008 WL 3874609, *11, 14).

Plaintiff relies on *Ostrowiecki* to support its position that the entire clause is null, which although persuasive, is distinguishable from the case at hand. In *Ostrowiecki,* this Court found that language limiting liability "from any claim or lawsuit" rendered the entire exculpatory provision null and unenforceable. 2008 WL 3874609, at *12–13. However, the contract at issue also included a severability clause that stated, "in the event that one or more of the provisions of this agreement . . . is held . . . to be invalid or unenforceable in any respect . . . this agreement shall be construed as if such . . . provision had never been contained herein." *Ostrowiecki*, 2008 WL 3874609, at *13. This Court found that the severability clause required the invalidation of the entire exculpatory provision and that the agreement could not "retain its meaning once those aspects which offend article 2004 [were] nullified." *Id.* at 13–14. As a result, the plaintiff was permitted to proceed with both their intentional tort and negligence claims. *Id.* at 14.

In contrast to *Ostrowiecki*, the severability clause in *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294, 309 (La. 2001), required a different outcome. In *Swat 24*, the severability clause provided that "each term and provision of the agreement shall be valid and enforceable to the fullest extent permitted by law."[79] *Id.* As this Court explained in *Ostrowiecki*, this formulation allowed the *Swat 24* court to "rescu[e] the valid portions of a provision, while striking the offending portions." 2008 WL 3874609, at 12.

Unlike the agreements in *Ostrowiecki* and *SWAT 24,* the landing card does not include a severability clause directing whether to remove the offending provision in its entirety. Other courts have relied on Louisiana Civil Code Article 2034 ("Article 2034") as authority to "delete from the exculpatory provision the offending claims . . . and to allow the remainder of the exculpatory provision to stand." *See Wadick*, 145 So. 3d at 599; *see also Precht v. Columbia Gulf Transmission, LLC*, No. 18-0853, 2019 WL 3368600 (W.D. La. July 24, 2019) (reasoning Article 2004 does not nullify an exculpatory clause "in its entirety . . . 'unless, from the nature of the provision of the intention of the parties, it can be presumed that the contract would not have been made without the null provision.'" (quoting Article 2034, other citations omitted)); *cf. Ostrowiecki*, 2008 WL 3874609, at \*11 (reasoning that Article 2034 "protects the integrity of an overall contract when a provision has been nullified").

Here, there is no applicable severability provisions, and it is consistent with the Fifth Circuit's approach in similar cases to find contractual limitations of liability

---

[79] Everett incorrectly argues that *Swat 24* did not include a severability provision.

23

unenforceable with respect to claims alleging damages for gross negligence. *See, e.g., Alonso v. Westcoast Corp.*, 920 F.3d 878, 885 (5th Cir. 2019); *Petrobras Am. Inc.*, 780 F. App'x at 100 (finding that Article 2004 nullifies application of contractual limits to liability for claims alleging physical injury or gross fault); *Occidental Chem. Corp.*, No. 92-0127, 1994 WL 17114860, *4 (W.D. La. Dec. 8, 1994), *aff'd*, 84 F.3d at 173 (granting summary judgment and finding "limitation of liability provisions . . . invalid insofar as they exclude liability for gross fault.").

The Court concludes that any application of Term (4) to claims alleging gross negligence is unenforceable pursuant to Article 2004. Whether defendants' alleged gross negligence caused plaintiff's damages is a factual issue left to the jury.

### iii.   *Whether Everett is an affiliate of Signature with respect to Term (4)*

According to the Civil Code, "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code. art. 2046. Additionally, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir.2007).

24

"[A] contract is ambiguous, under Louisiana law, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'" *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)) (cleaned up). "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 668 (5th Cir.1999) (citing *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998)).

The final issue for which plaintiff seeks summary judgment is whether Everett, as an employee of Signature, is included as an "affiliate" pursuant to the terms of the landing card and therefore shielded from liability to the extent Term (4) is enforceable. Plaintiff states that Signature affiliates, defined in the landing card as "Signature Flight Support LLC and its affiliates that are providing Services to the Customer at the Airport," refers to legal entities affiliated with Signature, not employees such as Everett.[80]

Tellingly, Signature does not use its briefing to inform the Court whether, as an employee, Everett is an "affiliate" of Signature as the term is used with respect to the landing card. Instead of directly addressing the issue before the Court, Signature deflects and states that "[t]o the extent that any of Signature's employees . . . act negligently and within the course and scope of their employment with Signature, the

---

[80] R. Doc. No. 46-1, at 16–17; R. Doc. No. 54, at 9–10.

terms of the Landing Card plainly apply to their status as employees."[81] However, Signature is already vicariously liable for tortious conduct of its employees through the "operation of law" pursuant to Louisiana Civil Code Article 2320. *See Lewis v. Hamilton,* 652 So. 2d 1327, 1330 (La. 1995). Additionally, the landing card could not create or duplicate a legal obligation between Signature and Everett because Everett is not a party to the landing card.

Everett argues that employees must fall under the umbrella of an affiliate because they are the individuals providing the services and products to the customer at the airport.[82] Although Everett protests that an affiliate may include natural persons, he does not provide any evidence that Signature ever used the term to define employees or applied the term to him in some other capacity.

In the present case, whether affiliates include employees is readily discernable through the application of the established rules of construction to the plain language of the landing card. Term (3) of the landing card states, "Customer agrees to indemnify . . . Signature and the Airport . . . to the defense of any claims arising out of Signature's acts or omissions, or the act[s] or omissions of its directors, officers, employees, agents or assigns . . . "[83] The only proposed definition that Everett advances that references employees in the context of affiliates is from the Investment Company Act of 1940 which defines "affiliated person" rather than affiliates—"any

---

[81] R. Doc. No. 51, at
[82] R. Doc. No. 52 at 9
[83] *See infra* Attachment A.

26

officer, director, partner, copartner, or employee."[84] Unfortunately, Everett's definition has an insurmountable defect. It is duplicative of the "directors, officers, employees, agents or assigns" provision in Term (3) and its inclusion would render the language in Term (3) essentially meaningless in contravention of Louisiana's basic tenets of contract interpretation. Further, the express inclusion of employees as a party in Term (3) and the term's exclusion from Term (4) indicates the drafters' intent. "Each provision of a contract must be interpreted in light of the other provisions, and a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one which renders it ineffective." *Lewis*, 652 So. 2d at 1330.

Accordingly, the term affiliate as it is used in the landing card unambiguously does not refer to Signature employees. Furthermore, Everett has not provided any evidence that the term applies to him in some other capacity with respect to the landing card. For the foregoing reasons, the Court finds that defendants have not established a genuine dispute of material fact with respect to the issue of whether Everett is an affiliate of Signature in accordance with Term (4) of the landing card.

## III.   CONCLUSION

**IT IS ORDERED** that defendant Phillip Everett's motion to dismiss is DENIED.

**IT IS ORDERED** that plaintiff's partial motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is **DENIED** with respect

---

[84] R. Doc. No. 52 at 9.

27

to plaintiff's arguments regarding whether the landing card is enforceable as a contract of adhesion. The motion is **GRANTED** with respect to whether Term (4) is unenforceable for claims alleging damages for gross negligence but **DENIED** with respect to whether Term (4) is unenforceable in its entirety. The motion is **GRANTED** with respect to whether Everett is an affiliate of Signature with respect to Term (4) of the landing card.

New Orleans, Louisiana, April 7, 2026.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

# ATTACHMENT A



# SIGNATURE AVIATION

## NEW

## N505FF  *West Ramp*

| Customer Information | | | Aircraft Information | |
|---|---|---|---|---|
| CPA # 152298 | | Pilot's Name  TRENT CADY | Aircraft Type Embraer Phenom 300 | Tail # N505FF |
| Company/Owner The Jones Company | | Cell Phone  912 282 2226 | ATA 12/30/2024 | 13:45 |
| Address 1 201 Pendleton Street | | Hotel  Royal Sonesta | ETD 01/02/2025 | 10:00 |
| Address 2 Suite A | | Shuttle Pick Up Time | On Line Time  09AM | |
| City Waycross | | # Pax In 4 | Ramp/Hangar Loc. | |
| State GA | Zip 31501-2316 | # Pax Out 4 | Res. # RES-7906711 | |

| Aircraft Services | | | | |
|---|---|---|---|---|
| Catering | ☐ | AvGas ☐   Jet A ☐   Jet A + ☐ | Requested Time | |
| Number | ☐ | Requested Amt. | Completed Time | |
| Linens | ☐ | Special Instructions | Fuel Truck | Fueler |
| Dishes | ☐ | | ASR Ticket # | |
| Crew Car | ☐ | | Oil Type | Qty. |
| Newspaper | ☐ | Total Gallons Delivered | Special Instructions | |
| Coffee | ☐ | Other Services | | |
| Ice | ☐ | | GPU  ☒ | Water ☐ |
| Flight Docs Delivered | ☐ | | Lav. ☐ | Cabin Clean ☐ |

**Definitions**: "Signature" refers to Signature Flight Support LLC and its affiliates that are providing Services to the Customer at the Airport. "Customer" refers to the legal entity Carrier for whom the [above][below] requested ground handling services will be or have been performed. "Airport" refers to the airport at which the services are performed. "Services" refers collectively to any ground handling related products and services furnished by Signature to Customer. **Terms**: (1) Notwithstanding any previous or subsequent agreements between the parties, the Terms of this agreement shall apply to the acts or omissions of Signature occurring within the network of fixed base operations owned, operated, controlled or managed by Signature. (2) Customer represents that it currently maintains policies of aircraft and commercial general liability insurance with respect to its aircraft, operations and maintenance, as well as "all risk" type hull insurance on its aircraft and engines. In the event any third-party claim is made against Signature, Customer's insurance carrier shall provide primary coverage. (3) Customer agrees to indemnify, save and hold harmless Signature and the Airport from and against any and all claims, suits, damages, fines and penalties including all expenses, reasonable attorneys' fees and costs incidental to the defense of any claims arising out of Signature's acts or omissions, or the act or omissions of its directors, officers, employees, agents or assigns in connection with this Agreement, except to the extent such claims arise from the negligence or willful misconduct of Signature. **To the extent a claim or loss arises from Signature's negligence or willful misconduct while performing a Service, Customer waives all rights of subrogation against Signature in connection with the claim or loss.** (4) The parties agree that under no circumstances shall Signature be liable to the Customer in relation to the Services for indirect, incidental, consequential, special or exemplary damages, whether in contract or tort (including strict liability and negligence), such as, but not limited to, loss of revenue, loss of use or anticipated profits, diminution or loss of value, travel room and meal accommodations, or costs associated with substitution or replacement aircraft. (5) Customer releases Signature from any damages sustained to Customer's aircraft or other personal property as a result of high winds or other adverse weather conditions. (6) In consideration of the Services provided by Signature, Customer agrees to pay all charges incurred for Services provided with respect to the aircraft described on this Agreement while located at the Airport, including reasonable attorneys' fees if collection is required. Signature shall have the right to retain possession of the aforementioned aircraft or its parts as security for the payment of Services. (7) By providing your email address, you authorize Signature Flight Support Corporation to contact you by email in the future: with customer satisfaction surveys; and information about products and services available through the Signature Aviation family of companies. Your email address will not be sold or licensed outside the Signature Aviation group for marketing purposes. **Data Privacy**: Signature uses Customer passenger and flight crew personal details to provide flight related services including facilitating passenger and flight crew entry into and exit from the country [and state] where the flight lands, or from which the flight departs. This necessarily includes handling information provided by Customer or its agent related to the passengers and flight crew passport and visa details, and if relevant, flight related health/access requirements and/or dietary/religious preferences or requests. **Trade Controls/Sanctions**: Customer represents that Customer, Customer's aircraft and its owner(s)/operator, Customer's passengers, origin, destination, and the purpose of route are not subject to sanctions, that the flight is being carried out in compliance with applicable trade controls, and that providing the Services will not cause Signature to be in violation of any trade controls or subject to any sanctions or other penalties. Trade controls include restrictions on: (i) transactions or other dealings with sanctioned countries/territories or sanctioned entities, individuals, or governments; (ii) exports, reexports, and other transfers of goods, software, and technology across borders, or to persons of other nationalities; and (iii) direct or indirect support of certain unsanctioned non-U.S. boycotts. Customer retains responsibility for compliance with all applicable trade controls. Any violation Signature discovers may result in immediate termination of the Services and may be reported to law enforcement authorities.

I have read and understand, and have authority to accept on behalf of the owner or manager of the aircraft, this agreement.

X _____    Date  12-30-24
Signature

Email Address   Wtcady@yahoo.com

| Tailwin#,Email/Phone | | Parking    $0.00 | |
|---|---|---|---|
| | | Ramp Overnight    $260.00 | |
| | | JETA    $6.70 | AVGAS    $8.50 |
| Direct Bill ☐ | | | |
| CC on File | | GPU $113.00 0gal-100.00% | GPU Start $113.00 0gal-100.00% |
| Pricing Program JETA  Retail | Pricing Program AVGAS  Retail | De-Ice Type 1    $0.00 | De-Ice Type 4  $0.00 |
| Receipt Email | | Hangar    $420.00 | |
| Lav    $150.00 | Min Fuel to Waive  200 | Handling  $1080.00  100-199gal-40.00% | |